**B. R. SLOCUM d/b/a Animal World, Plaintiff-Appellee,**

v.

**UNITED STATES of America and Earl Butz, Defendants-Appellants.**

No. 75–1242.

United States Court of Appeals, Fifth Circuit.

June 16, 1975.

Robert W. Rust, U. S. Atty., Lawrence B. Craig, III, Asst. U. S. Atty., Miami, Fla., Neil Koslowe, App. Section, Robert E. Kopp, Dept. of Justice, Washington, D. C., for defendants-appellants.

L. Alton Denslow, Washington, D. C., amicus curiae, for Poultry & Egg Inst. of America.

Vandroff, Mandell & Freshman, Lawrence N. Freshman, Richard J. Mandell, Miami, Fla., for plaintiff-appellee.

Before GODBOLD, Circuit Judge, SKELTON, Associate Judge,* and GEE, Circuit Judge.

GEE, Circuit Judge:

This case, somewhat less than run-of-the-mill, concerns mynah birds, African grey parrots, a variety of other exotic species to the retail value of half a mil-

* Of the U.S. Court of Claims, sitting by designation.

lion dollars—and Velogenic Viscerotropic Newcastle Disease (VVND), a deadly, communicable avian disease.[1]

### The Facts

Appellee B. R. Slocum, an importer of exotic birds, brought these birds into the country and, as required, quarantined them at two of his facilities in Florida. United States Department of Agriculture specialists inspected the birds, took tissue samples, and by established laboratory techniques isolated VVND virus from one group of the birds, the African grey parrots quarantined at Slocum's Station No. 1. On receipt of this report, Slocum disposed of these birds.

In the meantime, fate closed in on the other group of birds quarantined at Slocum's No. 2 Station; VVND virus was isolated from it as well. After taking special measures to verify this and consulting outside experts, the Department of Agriculture (Department) ordered Slocum to dispose of these also. This time Slocum, facing heavy financial loss and perhaps disaster, fought back. An expert virologist whom he retained was able to advise the Department that though, in his opinion, the second flock "were exposed to VVND" they were not infected. The Department, however, refused to grant his request to test the birds in his own laboratory or to reconsider its order that Slocum dispose of them. With this, Slocum went to law.[2]

### The Proceedings Below

Proceeding on an expedited hearing schedule, the district court took evidence on Slocum's complaint, which sought declaratory relief or relief "in the nature of mandamus," commencing within two weeks after its filing. Slocum's witnesses, including experts, pointed to the absence of proof that the birds were actually diseased and to the slender basis upon which the presence of virus, let alone disease, rested—two samples. The Department presentation, on the other hand, stressed the enormous risk to the poultry business posed, the dearth of knowledge about VVND's clinical course and manifestations in such birds as Slocum's, and that the presence of the virus among the birds had been established by the only sure test known to science. At the close of the hearing, the court determined that the Department's disposal order rested on substantial evidence and, though reluctantly, denied Slocum any relief.

Slocum then applied to the court for permission to conduct his own test by use of "sentinel chicks," sterile poultry to be placed in the cages, and the Department sought a warrant to seize the birds. The court refused the warrant and permitted the new test, which was generally negative. After another hearing, at which the test results were introduced and a highly qualified expert testified for the Department to his fears

---

1. This exotic disease spreads readily from birds to chickens. Kept at bay thus far, it has reached epidemic proportions abroad, but a recent outbreak in California accounted for eleven million chickens and fifty-six million dollars in control expenditures. Many things remain unknown about VVND, but there is testimony in the record from an admitted expert, described by Slocum's own expert witness as "one of the outstanding virologists" regarding the disease, that single isolations of VVND virus—such as occurred here—can establish its presence in entire flocks. He also testified that in this case his major fear is of the "intermediate transmitter," a sort of avian Typhoid Mary which receives and transmits the virus without itself becoming infected with the disease. Intermediate transmission of some veterinary viruses has been demonstrated, but this capability, though suspected, is

not yet established of VVND. Thus this fear, though grave, may prove a chimera.

2. We need not take up the interesting jurisdictional questions presented by this appeal, since we conclude that the district court should have denied the relief requested and since, in this instance, a finding of no jurisdiction would produce the same result which we reach on the merits. Had we concluded otherwise on the merits, a careful analysis would have been necessary. In brief, the Department claims its decision is one "committed to agency discretion by law" so as to defy review under the APA, while Slocum rejoins that the APA constitutes an affirmative grant of jurisdiction and that the decision is not within its narrow nonreview exception. Much could be written on these subjects but fortunately need not be.

of intermediate transmission by healthy but infectious carrier birds, the court remanded the matter to the Department for reconsideration. The Department took further consultation with a panel of experts, reviewed the evidence de novo, and reported to the court, in pertinent part, as follows:

1. VVND was isolated from tissue samples taken from birds in Slocum # 2;

2. The surviving birds in Slocum # 2 are exposed to VVND;

3. There are no definitive tests presently available, short of sacrificing every single bird, to determine whether the birds in Slocum # 2 are free of VVND;

4. The birds in Slocum # 2 are likely to introduce or disseminate VVND into the United States, and

5. In order to protect the poultry of the United States and to prevent such introduction or dissemination of VVND into the United States, the birds in Slocum # 2 cannot be allowed to enter commercial channels and must be refused entry into the United States.

This conclusion is in accordance with the applicable regulations in Part 92, Title 9, Code of Federal Regulation, which were promulgated pursuant to suggestions from, and with the active participation of, the commercial bird importing industry, including the Plaintiff B. R. Slocum. It is further within the authority vested in the Secretary of section 2 of the Act of February 2, 1903, as amended (21 U.S.C. 111), which states in applicable part:

The Secretary of Agriculture shall have authority to make such regulations and take such measures as he may deem proper to prevent the introduction or dissemination of the contagion of any contagious, infectious, or communicable disease of animals and/or live poultry from a foreign country into the United States . . . ;

and by section 4 of the Act of July 2, 1962 (21 U.S.C. 134c) which states:

The Secretary is authorized to promulgate regulations prohibiting or regulating the movement into the United States of any animals which are or have been affected with or exposed to any communicable animal disease, or which have been vaccinated or otherwise treated for any such disease, or which he finds would otherwise be likely to introduce or disseminate any such disease, when he determines that such action is necessary to protect the livestock or poultry of the United States.

On these considerations, the Department reaffirmed its order that the birds be disposed of.

After a final hearing, however, the court determined otherwise. Concluding that the regulations required the actual *existence of disease* for refusal of entry, that there was no reliable evidence showing this, and that the isolation of virus alone was insufficient to do so, the court found the Department's disposal order to lack a rational basis in fact and ordered the birds' admission.[3]

### Applicable Statutes and Regulations

Pursuant to 21 U.S.C. § 134c, quoted in pertinent part above in the Department's order on reconsideration,[4] the Department has promulgated regulations governing the importation, inter alia, of such birds as these. 9 C.F.R. Part 92 (1974). The regulations especially pertinent here (and the validity of which is conceded) are set out in the margin.[5]

---

**3.** But stayed its order pending this appeal.

**4.** The term "animals" as there used is elsewhere defined to comprise the entire animal kingdom, including birds but excepting the featherless biped. 21 U.S.C. § 134(b).

**5.** 92.11 . . .

. . . . .

(e) *Birds.* Each lot of commercial birds imported from any part of the world shall be quarantined for a minimum of 30 days, and for such longer period as may be required by

As applied to the case at hand, these may be summarized as requiring quarantine of such birds as Slocum's following which they are to be admitted if found "free of evidence of any communicable disease of poultry" but if found "to be infected with or exposed to" such a disease, they may be refused entry, further quarantined until found free of such evidence, or otherwise disposed of as directed by the Department. A special regulation for Newcastle disease permits use of sentinel birds and mandates destruction or refusal of entry if "frank or clinical" *disease* appears in bird or sentinel. Thus, the validity and general application of these regulations being undisputed, the narrow task of the trial court was to apply them to Slocum's birds. It concluded that only evidence of actual Newcastle *disease* in the birds could serve as the basis of an exclusion order, that no such evidence was forthcoming, and that therefore the order wanted a basis in fact. Though the matter is difficult and troubling, we are unable to agree.

▉ In selecting its "law" to apply, the court below focused exclusively on the regulation,[6] set out at footnote 5

above, which *mandates* disposal of birds in quarantine when they (or introduced sentinels) develop frank or clinical Newcastle disease. Presumably, though the court does not say so, this was in the view that in the circumstances presented this special regulation about Newcastle disease should control the more general 92.11(e) concerning "communicable diseases of poultry" in large. We think this view mistaken. The record abounds in evidence that Newcastle disease—and especially VVND, its most virulent and deadly form—is high on the Department's list of fears and a prime target among poultry diseases for exclusion from the country. We therefore think it unlikely the special regulation requiring disposal where Newcastle is full-blown and frankly present was intended or should be read to remove this disease from the more general coverage of 92.-11(e), which gives the Department a wider choice of measures where mere exposure to *some* communicable disease of poultry appears. Such a reading would give the Department wider powers over less serious diseases than over Newcastle. This seems contrary to sense and policy and is not required by the words

the Deputy Administrator, Veterinary Services, in any specific case, on an "all-in, all-out" basis, at one of the ports of entry specified in § 92.8(b) in facilities which are provided by the importer and which have been approved by the Deputy Administrator as provided in paragraph (f) of this section, prior to the issuance of the import permit described in § 92.4. During the quarantine period, the importer shall comply with handling procedures, (including inspection and testing) as provided in paragraph (f) of this section. If the birds are found free of evidence of communicable diseases of poultry during quarantine, then the port veterinarian shall issue an agricultural release for entry through U.S. Customs. If the birds are found during port of entry inspection or during quarantine, to be infected with or exposed to a communicable disease of poultry, such birds shall be refused entry or shall be held for an additional period in quarantine until determined to be free of evidence of any communicable disease, or shall be otherwise disposed of as directed by the Deputy Administrator, Veterinary Services, in accordance with the provisions of section 2 of the Act of July 2, 1962 (21 U.S.C. 134a).

See also paragraph (f)(3)(ii)(E) of this section.

. . . . .

(f)(3)(ii)(E). During the period of quarantine, the birds shall be subjected to such tests and procedures as are required in specific cases by the Veterinary Services port veterinarian, to determine whether the birds are free from communicable diseases of poultry. Such procedures may include requiring that sentinel birds be placed in the facility to detect the presence of exotic Newcastle disease. Such sentinel birds shall be provided by the importer from a source approved by the Deputy Administrator as adequate to supply birds meeting the requirements of Part 90 of this chapter. If frank or clinical Newcastle disease occurs among any commercial or sentinel birds in quarantine, all birds in the facility shall be destroyed or refused entry and the entire facility shall be thoroughly cleaned and then disinfected as directed under the supervision of a Veterinary Services inspector.

6. Unbelievably, 92.11(f)(3)(ii)(E).

of the more general regulation, words which plainly include Newcastle in their sweep. We think it more reasonable to view the specific regulation as one indicating special concern about Newcastle and forbidding the Department's taking milder measures than exclusion when the presence of that disease is actually observed. And since its actual presence was not observed here, we conclude the specific regulation has no application and turn to the more general.

When we do, we find that the Department has discretion to order disposal, as it has done here, where during quarantine birds are found ". . . to be infected with or exposed to a communicable disease of poultry, . . ." and is directed to admit them only when they are ". . . found free of evidence of . . ." such a disease. This is fatal to Mr. Slocum's cause and, we regretfully conclude, his birds. VVND virus was twice isolated from them. Slocum questions the field and laboratory processes by which this was done, and indeed there may have been imperfections in them; but his questions are based on little if anything more than an irrelevant and candidly-admitted error in labelling one specimen, which the Department volunteered when it could easily have remained silent, plus the general proposition that even scientists can and do err. Indeed, Mr. Slocum's own expert virologist was forced to admit that in his opinion the birds, though not infected, "were exposed to VVND." Slocum argues that the birds may not have been exposed to the *disease*, only to the virus that causes it. But such a view of the regulations, while logically possible, would reduce all isolation procedures to nonsense; were it accepted, an isolation of the virus could never be a basis for exclusion unless it was also shown the virus was received by exposure to a diseased bird, not to a carrier or to infected debris, etc. Such a construction is unworkable, such an intent or meaning unreasonable to ascribe to the regulations.

Doubts there may be that the disease is present in these birds or that, if released, they would infect domestic poultry. But such doubts are not for us to weigh in balance against the serious, possibly catastrophic, effects of admitting VVND virus to this country. That task is for the Department and its expert consultants. They have performed it and have acted within their powers in consequence of their decision. Their order must be enforced.

Reversed and rendered.