**SOUTHERN PACIFIC TRANSPORTA-TION COMPANY, Petitioner,**

v.

**W. J. USERY, Jr., Secretary of Labor, and Occupational Safety and Health Review Commission, Respondents,**

and

**United Transportation Union and American Federation of Labor-Congress of Industrial Organizations (AFL–CIO), Intervenors.**

**UNION PACIFIC RAILROAD COMPANY, Petitioner,**

v.

**W. J. USERY, Jr., Secretary of Labor, and Occupational Safety and Health Review Commission, Respondents,**

and

**United Transportation Union and American Federation of Labor-Congress of Industrial Organizations (AFL–CIO), Intervenors.**

**SEABOARD COAST LINE RAILROAD COMPANY, Petitioner,**

v.

**W. J. USERY, Jr., Secretary of Labor, and Occupational Safety and Health Review Commission, Respondents.**

and

**United Transportation Union and American Federation of Labor-Congress of Industrial Organizations (AFL–CIO), Intervenors.**

Nos. 74–3981, 75–1613, 74–3984.

United States Court of Appeals, Fifth Circuit.

Sept. 22, 1976.

Richard R. Brann, Houston, Tex., for Southern Pac. Transp. Co.

H. Lustgarten, Jr., Omaha, Neb., for Union Pac. R. R. Co.

Malcolm R. Maclean, Charles A. Edwards, Savannah, Ga., John W. Weldon and Edward Charron, Jacksonville, Fla., for Seaboard Coastline R. R. Co.

Allen H. Feldman, Atty., U. S. Dept. of Labor, Washington, D. C., George Avery, Regional Sol., U. S. Dept. of Labor, Dallas, Tex., William McLaughlin, Executive Secretary, OSHRC, Washington, D. C., Marvin M. Tincher, U. S. Dept. of Labor, Office of the Sol., Nashville, Tenn., Robert A. Friel, Associate Regional Sol., U. S. Dept. of Labor, Seattle, Wash., William Kilberg, Sol. of Labor, Benjamin W. Mintz, Associate Sol., Michael H. Levin, Counsel for Litigation, Baruch A. Fellner, Counsel for Regional Litigation, U. S. Dept. of Labor, Washington, D. C., for respondents.

Edward J. Hickey, Jr., William J. Hickey, William E. Fredenberger, Jr., Washington, D. C., for Ry. Emp. Dept., amicus curiae.

William M. Moloney and John B. Norton, Washington, D. C., for Ass'n of American R. R., amicus curiae.

Lawrence M. Mann, Washington, D. C., for intervenors AFL–CIO and United Transp. Union.

Before TUTTLE, GODBOLD and GEE, Circuit Judges.

GEE, Circuit Judge:

These consolidated cases involve a single question of statutory interpretation: whether the petitioners, at the time the violations involved here occurred, were obliged to comply with safety standards promulgated by the Secretary of Labor (the Secretary) pursuant to the Occupational Safety and Health Act (OSHA), 29 U.S.C. § 651 et seq. (1970). In No. 74–3981, Southern Pacific Transportation Co. petitions for review of an order of the Occupational Safety and Health Review Commission (OSHRC) finding that it committed four nonserious violations of 29 U.S.C. § 654(a)(2) in connection with the June 1972 operation of a diesel service shop in Houston, Texas. In No. 75–1613, transferred to this court by the Eighth Circuit, Union Pacific Railroad Co. petitions for review of a similar order adjudicating three violations of the same statute occurring in September

1972 in Union Pacific's train dispatching center in a yard office in Pocatello, Idaho. In No. 74–3984, Seaboard Coast Line Railroad Co. seeks review of an OSHRC order reversing the decision of its Administrative Law Judge (ALJ) that Seaboard could not be penalized for a nonserious statutory violation allegedly discovered during a March 1973 inspection of Seaboard's rail repair shop in Savannah, Georgia.[1] Because each petition presents for review the same and sole legal issue,[2] and except as specifically noted, we hereafter treat the petitioners as a single entity (the railroads).

These cases turn on the meaning of section 4(b)(1) of OSHA, 29 U.S.C. § 653(b)(1), which provides in Delphic terms:

> Nothing in this chapter [which encompasses the complete text of OSHA] shall apply to working conditions of employees with respect to which other Federal agencies, and State agencies acting under section 2021 of Title 42, exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health.

The railroads' position is that this section means that *any* "exercise," be it never so partial, by the Department of Transportation (DOT), acting through the Federal Railroad Administration (FRA), of its statutory authority to regulate railroad safety exempts the railroad industry from OSHA regulations to the full extent of DOT's potential regulatory authority.[3] This position, termed the "industry-wide" exemption theory, has been squarely rejected in *Southern Ry. v. OSHRC*, No. 75–1055, 539 F.2d 335 (4th Cir., 1976). Although our analysis follows a slightly different track, we agree with the Fourth Circuit's result and reject the railroads' argument.

The railroads and the Secretary agree that the exemption provided by section 4(b)(1) is not activated by mere existence in the FRA of statutory authority to regulate railroad safety; some "exercise" of that authority is necessary to oust OSHA's pervasive regulatory scheme. Thus, the statute generates an anomalous relationship between the Secretary and agencies such as the FRA, decreeing the existence of overlapping authority to regulate railroad safety, with displacement of OSHA coverage by the FRA dependent on unilateral action by the FRA rather than on either a determination by some neutral agency or on consultation between the Secretary and the FRA. All parties likewise agree that the only exercises of FRA authority before the dates on which the cited violations occurred were promulgation of regulations for specific

---

1. Alleging that the order remanding the case to the ALJ is not a reviewable order under 29 U.S.C. § 660(a), the Secretary moved to dismiss Seaboard's petition. During the pendency of the petition, the ALJ made a finding that a violation occurred, and OSHRC has granted review. Because a finding that we lack appellate jurisdiction would produce the same result—the continuation of OSHRC's review—as our decision on the merits, and because the merits of the petition are already before us in the other two cases, we need not and do not reach the jurisdictional question posed by the Secretary's motion. *See United States v. Augenblick*, 393 U.S. 348, 349–52, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); *Slocum v. United States*, 515 F.2d 237, 238 n. 2 (5th Cir. 1975); *cf. Norton v. Mathews*, — U.S. —, —, 96 S.Ct. 2771, 49 L.Ed.2d — (1976).

2. Southern Pacific and Union Pacific conceded that the cited noncompliances existed; Seaboard denied the violation, but this factual issue is not before us now.

3. The most comprehensive source of the FRA's authority to regulate railroad safety is the Federal Railroad Safety Act, 45 U.S.C. § 421 *et seq.* (1970). Intervenors United Transportation Union and the AFL–CIO argue that this statute does not empower the FRA to regulate the working conditions involved in these cases either because they are not peculiar to rail transportation or because they raise health, as opposed to safety, issues. We intimate no view on the merits of these arguments. We must decide the railroads' claim of an industry-wide exemption regardless of the precise scope of FRA authority. Our conclusion that existing FRA activity does not displace OSHA coverage in these cases makes it unnecessary to consider whether any of that activity is outside the FRA's statutory authority. And it is obviously unnecessary to decide whether the FRA's authority would permit it to regulate these working conditions so as to oust OSHA in the future.

items of railroad operating equipment and development of an accident-reporting and record-keeping system. Although the issue of statutory interpretation must be addressed in broader terms, the first specific question in these cases is therefore whether these acts are a sufficient "exercise" to activate section 4(b)(1) and thus preempt OSHA coverage of other aspects of railroad employees' safety.[4] We conclude that they are not.

█ The railroads suggest that the phrase "working conditions of employees" in section 4(b)(1) is equivalent to "industries." Building on a comparison between section 4(b)(1) and 29 U.S.C. § 673(a), which exempts "employments excluded by [section 4]" from OSHA's statistical provisions, they argue that "employments" is equivalent to "industries" and that section 4(b)(1) therefore creates an industry-wide exemption. The effect of this argument is first to magnify a minimal ambiguity and then to resolve it by reference to a more ambiguous provision.[5] We think the term "working conditions" plainly refers to something more limited than every aspect of an entire industry. The term has a technical meaning in the language of industrial relations; it encompasses both a worker's "surroundings" and the "hazards" incident to his work. *Corning Glass Works v. Brennan*, 417 U.S. 188, 202, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). And while we must concede that the reference to section 4 in 29 U.S.C. § 673(a) is confusing, we do not agree that this reference gives the phrase "working conditions" a meaning which never appears elsewhere in OSHA—that of "industries." Indeed, other sections of OSHA imply that

the term "working conditions" has a narrow scope. *See, e. g.,* 29 U.S.C. § 670(c)(1).

█ The structure of section 4(b)(1), particularly its cross-reference to 42 U.S.C. § 2021 (1970), reinforces our conclusion that the FRA's pre-1975 regulatory activity did not displace the general OSHA regulatory scheme. Section 2021 deals with state regulation of the atomic energy industry. It provides a detailed system in which regulation for some purposes is explicitly left to the states, regulation of certain activities is reserved to the Atomic Energy Commission, and regulatory authority over certain materials is entrusted to the federal government subject to federal-state agreements to transfer this authority to a state. Such an arrangement is the antithesis of an industry-wide exemption. We think it most unlikely that section 4(b)(1) was intended to establish industry-wide exemptions for industries otherwise regulated by the federal government when the scope of its exemption for state regulation is so meticulously limited to specific topics.

█ .We also find support for our conclusion in the legislative history of OSHA. The railroads offer a colloquy on the House floor as the definitive legislative history of section 4(b)(1).[6] However, this colloquy dealt with a version of the House bill, a version that differed from the final text of section 4(b)(1) in that it exempted "working conditions of employees with respect to *whom* other Federal agencies . . . exercise statutory authority . . . ." *See, e. g.,* Leg.Hist., *supra* n. 5, at 1135 (emphasis added). The Senate proceedings clearly demonstrate that the Senate language was not intended to create an industry-wide ex-

---

4. We are not asked to review OSHRC's conclusion that the FRA's recording requirements activate section 4(b)(1) to displace OSHA record-keeping regulations.

5. Although this case does not require a definitive interpretation of 29 U.S.C. § 673(a), we note that the legislative history offers substantial support for the Secretary's position, rejected by OSHRC, that "employments" refers only to the geographic exemptions of section 4(a), 29 U.S.C. § 653(a). *Compare* S. 2193, 91st

Cong., 2d Sess., § 21(b), *reproduced* in Staff of Senate Comm. on Labor and Public Welfare, 92d Cong., 1st Sess., Legislative History of the Occupational Health and Safety Act of 1970, 585 (Comm.Print 1971) (hereinafter cited as Leg.Hist.) (final version of Senate bill) *with* Leg.Hist. 1120 & 1135 (final version of House bill—source of 29 U.S.C. § 673(a)).

6. This colloquy, the so-called Erlenborn-Daniels colloquy, is found at 116 Cong.Rec. 38,381–82

emption.[7] The conference committee recognized the difference in language and consciously chose the Senate version.[8] Since the legislative process—the process by which Congress arrived at the statutory language—is often a better guide than the interpretations of individual legislators or committee reports, see *Corning Glass Works v. Brennan*, 417 U.S. 188, 198, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974), we attach some weight to the substitution of the Senate version for that passed by the House. And although the Senate's language remains less than pellucid, the conscious and deliberate substitution of that language for the House version tending more clearly toward an industry-wide exemption strongly suggests that the statute as passed contemplates a narrower kind of exemption. *Cf. American Smelting & Refining Co. v. OSHRC*, 501 F.2d 504, 508–13 (8th Cir. 1974).[9]

Finally, the purpose of OSHA, announced in particularly expansive terms, is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources . . . ." 29 U.S.C. § 651(b). If this be the goal, it seems unlikely that Congress would wish the ubiquitous OSHA regulations in question here to be displaced by the FRA's limited operating-equipment and accident-reporting activity. Placed in this context, the railroads' interpretation of section 4(b)(1) as an industry-wide exemption becomes an assertion that a requirement of accident reporting displaces substantive standards designed to prevent accidents—an assertion inconsistent with such an announced statutory purpose.

Our rejection of the railroads' position does not constitute an acceptance of the theory that every OSHA regulation remains operative until the FRA adopts a regulation of its own on that specific subject. As we have noted, the statutory term "working conditions" embraces both "surroundings," such as the general problem of the use of toxic liquids, and physical "hazards," which can be expressed as a location (maintenance shop), a category (machinery), or a specific item (furnace). Neither OSHA itself nor the existence of OSHA regulations affects the ability of the primary regulatory agency, here the FRA, to articulate its regulations as it chooses. Much of their displacing effect will turn on that articulation. Section 4(b)(1) means that any FRA exercise directed at a working condition—defined either in terms of a "surrounding" or a "hazard"—displaces OSHA coverage of that working condition. Thus, comprehensive FRA treatment of the general problem of railroad fire protection will displace all OSHA regulations on fire protection, even if the FRA activity does not encompass every detail of the OSHA fire protection standards, but FRA regulation of portable fire extinguishers will not displace OSHA standards on fire alarm signaling systems.[10]

(Mar. 23, 1970), *reproduced in* Leg.Hist., *supra* n. 5 at 1018–21.

7. S.Rep.No.1282, 91st Cong., 2d Sess. (1970), *reproduced in* Leg.Hist. *supra* n. 5, at 141, states:
    The bill does not authorize the Secretary of Labor to assert authority under this bill over *particular working conditions* regarding *which* another Federal agency exercises statutory authority to prescribe or enforce standards affecting occupational safety and health. (emphasis added)
    *Id.* at 22, Leg.Hist. at 162; U.S.Code Cong. & Admin.News 1970, p. 5199.

8. *See* Leg.Hist., *supra* n. 5, at 1185–86 (Statement of the Managers on the Part of the House). Indeed, the leader of the House representatives on the conference committee remarked in introducing the conference bill to the House that, "[t]here was a major difference in the two bills in the treatment of the proposed effect on other preexisting health and safety statutes." 116 Cong.Rec. 42,201 (Dec. 17, 1970) (remarks of Cong. Perkins), *reproduced in* Leg.Hist., *supra* n. 5, at 1204.

9. We give regard to the legislative process as a whole rather than merely to the simple grammatical change from "whom" to "which."

10. In *Southern Ry. v. OSHRC*, No. 75–1055, 539 F.2d 335 (4th Cir., 1976), the court likewise interpreted section 4(b)(1) in a manner which avoided the extreme positions of the Secretary and the railroads. The Fourth Circuit defined "working conditions" as "the environmental area in which an employee customarily goes about his daily tasks." *Id.* at 339. Our conclusion that the operative effect of section 4(b)(1) is determined by the manner in which the FRA articulates its exercise of au-

Furthermore, as the dominant agency in its limited area, the FRA can displace OSHA regulations by articulating a formal position that a given working condition should go unregulated or that certain regulations—and no others—should apply to a defined subject.

■ We recognize that a regulatory exercise expressed in terms of a category of equipment or a generalized problem may raise questions about whether a given item is covered. Conversely, an exercise expressed in terms of a piece of equipment may create an issue about whether the FRA has regulated the entire category to which that piece belongs. In either situation, the scope of the exemption created by section 4(b)(1) is determined by the FRA's intent, as derived from its articulations.

■ We are sympathetic to the railroads' argument that regulatory duplication is undesirable because it makes it excessively difficult for the employer to know which standards he is required to obey and may create undue expense from successive compliance with different standards. But we think it clear that avoiding duplication was a secondary purpose of the OSHA/FRA scheme. OSHA was drafted in recognition of the possibility, since realized, that the FRA would fail to implement its authority before some OSHA regulations became effective. These unfortunate consequences, inherent in the nature of the beast, may be avoided or greatly minimized by a clear statement, in each instance of displacing regulation, of the FRA's position on these preexisting OSHA regulations which it seeks to oust.

■ Finally, the railroads contend that the FRA's March 1975 "Advance Notice of Proposed Rule-Making," inviting pre-proposal comment on numerous substantive regulations,[11] combines with preexisting FRA activity to constitute the requisite "exercise" of the FRA's statutory authority. The FRA's 1975 activities are irrelevant to the Union Pacific and Southern Pacific petitions. The violations involved in these two cases, and final administrative decisions on them, occurred before 1975, and the Secretary does not now seek to enforce OSHRC's orders. The March 1975 action may be relevant, however, to Seaboard's petition, and we therefore consider its impact. We agree with the Fourth Circuit's view in *Southern Ry., supra,* that this speculative announcement adds nothing to previous FRA activity and is not a sufficiently concrete "exercise" to preempt the otherwise applicable regulations. Section 4(b)(1) requires an actual "exercise" of "authority to prescribe or enforce standards or regulations," and this bare announcement that the FRA is considering promulgation of regulations does not suffice, either alone or in combination with previous activity.[12] The railroads rely on the remarks of the House bill's sponsor that preemption would occur when other agencies were in "the formative stages of regulations or enforcement." 116 Cong.Rec. 38,373 (Nov. 23, 1970) (remarks of Cong. Steiger), *reproduced in* Leg.Hist., *supra* n. 5, at 997. These remarks, whatever they indicate about the intent of the whole Congress, do not convince us that Congress meant for section 4(b)(1) to be activated in the present circumstances by mere announcements of possible regulatory action. Congress obviously wanted railroad health and safety conditions to be regulated forthwith by *some* agency since it took the unusual step of requiring an actual exercise of authority to forestall OSHA coverage. It seems unlikely that this same Congress could have meant for *existing and operative OSHA*

thority seems to us more attuned to the differing possible meanings of the term "working conditions" as it is used elsewhere in the field of industry relations.

11. *See* 40 Fed.Reg. 10,693 (1975). This notice requests comments on enumerated, existing OSHA regulations, including some of those relevant to railroad shops and offices.

12. 121 Cong.Rec. 21,261 (daily ed., Dec. 5, 1975) (remarks of Sen. Williams, author of the Senate version of OSHA). *Contra, Dunlop v. Burlington Northern R. R.,* 395 F.Supp. 203 (D.Mont.1975). The "Advance Notice" is merely a preliminary to a formal "Notice of Proposed Rulemaking." *Compare* 40 Fed.Reg. 10,693 (1975) *with* 39 Fed.Reg. 25,959 (1974).

*regulations* to be displaced without more conclusive FRA action than a mere statement of intent to do something in the future. Acceptance of the railroads' theory would produce an especially ludicrous result in the *Seaboard* case; the FRA's still-inoperative proposal to adopt a ventilation regulation would abort OSHRC's effort to induce compliance with an identical OSHA regulation.[13]

We have carefully considered the other maxims of statutory construction and aids to statutory interpretation marshalled by the parties, particularly the interaction between OSHA and the Federal Railroad Safety Act, 45 U.S.C. § 421 *et seq.* (1970), the Rail Passenger Service Act, 45 U.S.C. § 501 *et seq.* (1970), the Amtrak Improvement Act, 45 U.S.C. § 502 (Supp.1973), and the Rail Safety Improvement Act, 45 U.S.C. § 440 (Supp.1974). We find these additional considerations insufficiently persuasive on either side of the questions before us to require further discussion.

To summarize our view of section 4(b)(1), OSHA coverage is displaced by an "exercise" of DOT authority only for the "working condition" embraced by that exercise. Since DOT has not yet exercised its authority on the working conditions which are the subject of these OSHRC orders, the petitions for review are DENIED.

---

**13.** *See* 40 Fed.Reg. 10,693, 10,694 (1975). We would confront a different question, one on which the railroads' legislative history might be more persuasive, if the FRA "exercise" were already in a "formative stage" when an OSHA regulation on the same working condition became effective. Thus, our conclusion intimates no view on whether any OSHA regulations newly effective after March 1975 on topics covered in the "Advance Notice" apply to the railroad industry. In the same vein, we need not and do not consider the Secretary's position that only action which creates a regulatory "standard" within the meaning of 29 U.S.C. § 652(8) is an "exercise" triggering section 4(b)(1).