**PBR, INC., Petitioner,**

v.

**SECRETARY OF LABOR and Occupational Safety and Health Review Commission, Respondents.**

**No. 80–1376.**

United States Court of Appeals, First Circuit.

Argued Feb. 5, 1981.

Decided March 11, 1981.

---

Richard L. Patz, Providence, R. I., with whom Bruce M. Selya, and Selya & Iannuc-

cillo, Inc., Providence, R. I., were on brief, for petitioner.

Shelley D. Hayes, Atty., U. S. Dept. of Labor, Washington, D. C., with whom Carin A. Clauss, Sol. of Labor, Albert H. Ross, Regional Sol., Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health, and Allen H. Feldman, Counsel for Appellate Litigation, Washington, D. C., were on brief, for respondent Secretary of Labor.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, HOFFMAN, Senior District Judge.*

WALTER E. HOFFMAN, Senior District Judge.

This is a petition, brought under § 11(a) of the Occupational Safety and Health Act of 1970 (the Act), 29 U.S.C. § 660(a), to review an order of the Occupational Safety and Health Review Commission (OSHRC) assessing a penalty of $240 for a serious [1] violation of 29 C.F.R. § 1910.212(a).[2]

The facts are largely undisputed. PBR, Inc., (PBR) is a manufacturing corporation which has a principal place of business in Oak Brook, Illinois. The company has never owned or operated any railroad passenger lines, freight lines, or rights of way. PBR does not own any property other than equipment needed for the work of revitalizing railbeds, such necessary equipment in-

---

* Of the Eastern District of Virginia, sitting by designation.

1. A serious violation is one which creates:
   a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations, or processes which have been adopted or are in use, in such place of employment, unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.
   29 U.S.C. § 666(j).

2. 29 C.F.R. § 1910.212(a)(1) provides:
   [o]ne or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from the hazards such as those created by the point of operation, ingoing Nip points, rotat-

ing parts, flying chips and sparks. Examples of guarding methods are—barrier guards, two handed tripping devices, electronic safety devices, etc.
29 C.F.R. § 1910.212(a)(3) further provides:
Point of operation guarding.
(i) Point of operation is the area on a machine where work is actually performed upon the material being processed.
(ii) The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

cludes an "undercutter", a "flat car" for storage, and a "converted baggage car" for tools.

In April 1977, the Federal Railroad Administration (FRA) through the National Railroad Passenger Corporation (AMTRAK) executed a contract with Portec, Inc. (Portec). By the terms of the contract Portec was to improve the condition of railroad tracks situated in the Northeast Corridor (between Washington, D.C. and Boston, Massachusetts). Portec, in turn, contracted with PBR, its wholly owned subsidiary, to perform the work.

Revitalization of the railroad tracks was to be accomplished through the use of an "undercutter" owned and operated by PBR. An undercutter is an extremely large self-propelled machine which runs on railroad tracks. This machine is uniquely designed to perform an entire series of functions related to railroad bed revitalization. The undercutter in one continuous operation lifts rails, digs out the soil and rock under the railroad ties, screens the spoils, returns clean ballast to the area under the ties, and levels the track. On the right side of the undercutter is a retractable cylinder or "arm" which is extended during the "working mode." Surrounding the retractable cylinder is a moving chain, with attached pieces of steel (referred to as "dogs", blades or paddles), each about one foot long with three inch claws situated on every other blade. The blades dig into the ground under the railroad ties and cause adjacent soils to shake and slide.

On August 24, 1974, PBR employee, Robert Degan, was walking approximately four feet from the side of the undercutter arm when his left foot (the foot nearest the undercutter) slipped, just as one of the descending blades was penetrating the ground. Degan was drawn into the chain of the machine while it was in operation and was killed instantly.

The deceased was one of four PBR employees, with headsets for communication, stationed at the front, rear and sides of the undercutter; each was equipped with a headset for communication. Degan was as-

signed to the right side of the machine where the retractable cylinder or "arm" was attached to the undercutter. It was Degan's duty to look ahead for rocks or other obstacles and to monitor the flow of ballast. Degan routinely positioned himself within four to eight feet from the blades of the moving chain in performing this task. The controls utilized by Degan to monitor the flow of ballast were located on the front of the machine approximately six to eight feet in front of the chain. Consequently, in order to reach these controls it was necessary to walk in front of the chain as it was operating. Despite the known hazard presented by the chain, the chain and its blades were not guarded. Instead, PBR warned its employees of the danger "of coming too close" to the chain.

On the day of the fatality, and in response to a report of the accident, a compliance officer of the Occupational Safety and Health Administration (OSHA) inspected PBR's worksite pursuant to section 8(a) of the Act. Thereafter, the Secretary of Labor issued PBR a citation charging it with a serious violation of 29 C.F.R. § 1910.-212(a)(1) for the failure to provide machine guarding at the undercutter's point of operation. PBR timely contested the citation and the Secretary of Labor filed a complaint on October 24, 1978. Subsequently, PBR filed a motion to dismiss based on section 4(b)(1) of the Act, upon which a hearing was held before an administrative law judge of the Commission on May 2, 1979. The administrative law judge issued his decision and order denying PBR's motion to dismiss on May 31, 1979. The matter was heard on the merits on January 24, 1980. On April 2, 1980, the administrative law judge issued a decision and order affirming the machine guarding citation as a serious violation of 29 C.F.R. § 1910.212(a), and imposing a penalty of $240 for said violation. Pursuant to 29 U.S.C. § 661(i), PBR petitioned the Commission for discretionary review, no commissioner directed review of the decision; accordingly, the administrative law judge's order became a final order of the commission by operation

of law. 29 U.S.C. § 661(i). PBR appeals to this Court arguing that (1) the Commission's finding that PBR violated 29 U.S.C. § 654(a)(2) and 29 C.F.R. § 1910.212(a)(1) by failing to provide machine guarding to protect its employees from the hazard created by the operation of the undercutter was error because machine guarding was not possible or feasible; (2) the Commission's violation finding was invalid, that body's authority being precluded by section 4(b)(1) of the Act, 29 U.S.C. § 653(b)(1); and (3) the machine guarding regulation, 29 C.F.R. § 1910.212(a)(1), is so vague as to violate the employer's Fifth and Fourteenth Amendment rights.

I.

The purpose and policy of the Act is "to assure so far as possible every working man and woman in the nation safe and healthful working conditions . . . ." 29 U.S.C. § 651. To achieve that goal, the Act imposes on employers two kinds of duties. The employer has a general duty to provide a place of employment which is "free from recognized hazards that are causing or are likely to cause death or serious physical harm." 29 U.S.C. § 654(a)(1). Additionally, the employer must comply with specific standards promulgated by the Secretary of Labor. 29 U.S.C. § 654(a)(2). "Dereliction of either duty is a violation of the Act quite apart from whether injury to an employee results. And while the occurrence of injury may be relevant to proving a violation, it is not conclusive. But the Act does provide for more severe penalties for a violation when, as here, death results." *Cape and Vineyard Division of New Bedford Gas v. Occupational Safety and Health Review Commission,* 512 F.2d 1148, 1150 (1st Cir. 1975).

The court notes that review is limited to the record produced before the administrative law judge. Judicial review of the findings of fact below is restricted to a determination of whether such findings are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 660(a). *See: Cape and Vineyard Division of New Bedford Gas, supra,* at 1153.

The record below contains findings made by the administrative law judge which are supported by substantial evidence. Specifically, the ALJ found: that the company "unquestionably knew of the hazardous conditions to which the employees in the area were exposed, at least one point of operation was located where the descending blades of the chain entered the ground under the railroad tie", and that abatement of the hazard was "feasible." PBR raises three defenses to the ALJ's findings: impossibility of compliance, the greater hazard defense, and employee misconduct.

A. *Impossibility of Compliance.*

PBR argues here, as it did below, that compliance with the standard was impossible because under contracts with both AMTRAK and Secmafer, the machine's manufacturer, PBR had no authority to effect changes in the machine's physical makeup. In addition, PBR contends that the safety rules and regulations for this job were developed by the consulting firm of DeLeuw/Cather Parsons & Associates (DCP) and PBR was without authority to change these safety regulations.

In advancing this argument, PBR overlooks the critical fact that it retained significant safety control over its employees at all times. *Bechtel Power Corp. v. Secretary of Labor,* 548 F.2d 248 (8th Cir. 1977); *Clarkson Construction Co. v. OSHRC and Secretary of Labor,* 531 F.2d 451 (10th Cir. 1976). Although the safety rules were developed by DCP as the consulting engineers for the project, clearly it was PBR's responsibility to require its employees to adhere to such rules. *I.T.O. Corp. of New England v. OSHRC,* 540 F.2d 543 (1st Cir. 1976). Moreover, by the terms of its contract with Portec, PBR specifically agreed to be "responsible for complying with any applicable Federal laws . . . [and to] take proper safety and health precautions to protect workers." Under such circumstances, PBR was required to obtain permission from AMTRAK or Secmafer to effect such alterations to the machine as was necessary to protect its employees. Even if PBR was bound by

contracts it could not alter, the company would not be excused from responsibility under the Act. "[T]he Act, not the contract, is the source of [the employer's] responsibilities." *Central of Georgia Railroad Co. v. OSHRC and Marshall*, 576 F.2d 620, 625 (5th Cir. 1978). *See also: Frohlick Crane Service, Inc. v. OSHRC*, 521 F.2d 628, 631 (10th Cir. 1975). PBR owned the undercutter, controlled work at the site, and permitted its employees to be exposed to a severe hazard. In such circumstances, to allow PBR to escape responsibility for its employees' safety based upon contractual arrangements would defeat Congressional intent that employers be held responsible for abating hazards to which their employees are exposed.[3]

PBR has not shown that it took all demonstrably feasible measures to protect its employees. Therefore, PBR failed to demonstrate that it was actually impossible to effectuate compliance with the standard and its defense must fail. *Central of Georgia Railroad Co., supra; Southern Colorado Prestress v. OSHRC*, 586 F.2d 1342 (10th Cir. 1978).

### B. *Greater Hazard*

■ PBR argues that it was excused from compliance with the Standard because compliance would have created a "greater hazard" than non-compliance. The "greater hazard" defense is narrowly construed and the burden of proof lies with the employer. *Greyhound Lines-West v. Marshall*, 575 F.2d 759, 762 (9th Cir. 1978). OSHRC and the courts have placed a three-folded burden on employers seeking to invoke this affirmative defense: "[t]he employer must demonstrate: (1) that the hazards of compliance are greater than the hazards of non-compliance, (2) that alternative means of protecting employees are unavailable and (3) the unavailability or inappropriateness of obtaining a variance." *Noblecraft Industries, et al. v. Secretary of Labor*, 614 F.2d 199, 205 (9th Cir. 1980).

■ PBR contends that machine guarding would have created a greater hazard "to interference with passing trains and the possibility of train wrecks." However, it is undisputed that subsequent to the fatality a machine guard was installed. The potentiality of a "greater hazard" was effectively eliminated by stopping passing trains on adjacent tracks while the undercutter was in operation. In fact, it was only necessary to halt trains on two occasions after the guard was installed. Additionally, PBR fails to offer a satisfactory explanation for neglecting to request a variance. This requirement is necessary in order to ensure that employers will not subject their employees to safety hazards on the basis of an incorrect assumption that their noncomplying work places are safer than sites complying with the standards. *General Electric Company v. Secretary of Labor*, 576 F.2d 558, 561 (3rd Cir. 1978). Accordingly, PBR has failed to meet its burden of proof to establish this affirmative defense.

### C. *Employee Misconduct*

■ PBR raises the affirmative defense of isolated employee misconduct. The company contends that it was relieved from responsibility because the deceased employee ignored repeated warnings to be careful of the undercutter. PBR's argument is without merit; the record demonstrates that there was no misconduct. The deceased in the normal course of his employment was exposed to a hazardous condition, with the knowledge of the employer. PBR cannot escape responsibility for the violation because it warned its employees to exercise caution. Such a delegation of employee safety to the employees themselves is clearly inconsistent with the purposes and policies of the Act. *Empire Detroit Steel Division v. OSHRC*, 579 F.2d 378, 385 (6th Cir. 1978); *Atlantic & Gulf Stevedores, Inc.*,

---

**3.** *Anning-Johnson Co. v. OSHRC*, 516 F.2d 1081 (7th Cir. 1975), cited by PBR, is inapposite. In *Anning-Johnson*, the court held that sub-contractors were not liable for hazards they neither created, controlled nor were responsible for pursuant to their contractual duties. Here, PBR was responsible for safety control pursuant to contract and the hazard created by the undercutter's point of operation.

*et al. v. OSHRC*, 534 F.2d 541, 553, 554 (3rd Cir. 1976).

## II.

PBR argues that the Commission erred in failing to grant the company's motion to dismiss based on section 4(b)(1) of the Act, 29 U.S.C. § 653(b)(1). This section provides in pertinent part:

> Nothing in this Act shall apply to working conditions of employees with respect to which other Federal agencies . . . exercise statutory authority to prescribe or enforce standards or regulations affecting occupational safety or health.

The parties agree that the exemption provided by section 4(b)(1) is activated by statutory authority in another agency and an actual exercise of such authority by the agency. *Southern Pacific Transportation Co. v. Usery*, 539 F.2d 386, 389 (5th Cir. 1976). The exemption does not oust OSHA of its regulatory authority where such an agency has regulatory authority but has not exercised such authority. *Southern Railway Co. v. OSHRC*, 539 F.2d 335, 336 (4th Cir. 1976), *cert. denied*, 429 U.S. 999, 97 S.Ct. 525, 50 L.Ed.2d 609.

PBR contends that the Secretary of Transportation possesses the requisite statutory authority to act in matters of safety generally related to the railroads pursuant to the Federal Railroad Safety Act, 45 U.S.C. § 421 *et seq.* Although the Secretary of Transportation is authorized to promulgate rules in "all areas of railroad safety", 45 U.S.C. § 431(a), the applicability of those rules is, of course, limited to entities within their scope, i. e., the persons or entities for whom compliance is mandated. Civil penalties may be assessed pursuant to the Federal Railroad Safety Act only against railroads and only railroads are mandated to comply with the Act and its implementing regulations. 45 U.S.C. § 438. The administrative law judge found that PBR was not a railroad and accordingly the railroad regulations relied on by the company did not serve to exempt PBR from compliance with OSHA standards. We find it unnecessary to reach the issue of whether PBR is a railroad.

■ The Fifth Circuit analyzed the exemption provided by section 4(b)(1) in *Southern Pacific Transportation v. Usery, supra*, at 391, and concluded that OSHA's authority to regulate a given working condition, defined in terms of a "surrounding" or a "hazard", is foreclosed only insofar as another agency has exercised its authority to regulate that working condition. Thus, in order for the exemption to apply it must be shown that another agency has exercised its authority to regulate the "working condition" involved here, i. e., employee exposure to the undercutter's unguarded point of operation. PBR has failed to identify any safety rule promulgated by the Secretary of Transportation concerning the "hazard" posed by the undercutter's unguarded point of operation. Although PBR cites 49 C.F.R. § 213.11 in support of its pre-emption argument, that regulation applies to track conditions of "all standard gauge track," 49 C.F.R. §§ 213.1, 213.3 and presumably, to the "hazard" created by use of track in poor condition. The Secretary of Labor's regulation, on the other hand, applies to machinery which produces "hazards such as those created by the point of operation", 29 C.F.R. § 1910.212(a)(1). We conclude that there is simply no relationship between the regulations promulgated by the Secretary of Transportation under 49 C.F.R. §§ 213.1 and 213.3 and those promulgated by the Secretary of Labor under 29 C.F.R. § 1910.212(a)(1). Since the Secretary of Transportation has in no way indicated a broader effect for regulations promulgated by his agency, section 4(b)(1) does not operate to foreclose the Secretary of Labor's exercise of authority in this case.

■ PBR alternatively contends that the exemption is operative because the Secretary of Transportation, acting through the Federal Railroad Administration (FRA) and the engineering firm DCP, has exercised his authority pursuant to the Federal Railroad Safety Act of 1970, *supra*, to promulgate and enforce safety regulations affecting the working condition of its employees. Specifically, PBR contends that the safety rules

issued by DCP in its capacity as consulting engineer are an exercise of the Secretary of Transportation's rule-making authority which triggers the 4(b)(1) exemption. This argument is without merit. In promulgating rules and regulations for areas of railroad safety the Secretary of Transportation is required to comply with 5 U.S.C. § 553 and the public hearing requirements contained therein. 45 U.S.C. § 431(b). It is clear, according to the Administrative Procedure Act (APA), and the Federal Railroad Safety Act, that an agency may not "promulgate" a "rule" through contractual arrangements. Therefore, the "rules" drafted by DCP are similar to internal safety regulations and cannot be viewed as official agency rules which must be promulgated according to APA procedures.

PBR argues that 29 C.F.R. § 1910.212(a)(1) is so vague as to violate the company's Fifth and Fourteenth Amendment rights. The general rule is that remedial civil legislation "should be considered in light of its application rather than on its face." *McLean Trucking Company v. OSHRC*, 503 F.2d 8 (4th Cir. 1974). As long as the regulation "affords a reasonable warning of the proscribed conduct in light of common understanding and practices, it will pass constitutional muster." *Ryder Truck Lines, Inc. v. Brennan*, 497 F.2d 230, 233 (5th Cir. 1974). Moreover, this Court has held that the standard at issue is not unduly vague. The conduct required by the standard is clear: the employer must provide machine guarding where a hazard is created by a point of operation. *A. E. Burgess Leather Co. v. OSHRC*, 576 F.2d 948, 951 (1st Cir. 1978). Thus, PBR's argument is without merit.

AFFIRMED.