649 F.2d 96
 9 O.S.H. Cas.(BNA) 1554, 1981 O.S.H.D. (CCH) P 25,329
PRATT & WHITNEY AIRCRAFT, DIVISION OF UNITED TECHNOLOGIES
CORPORATION, Petitioner,
v.
SECRETARY OF LABOR and Occupational Safety and Health Review
Commission, Respondents.
 No. 326, Docket 80-4102.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 6, 1980.
Decided April 20, 1981.
 
 John A. McGuinn, Washington, D. C. (Farmer, Wells, McGuinn, Flood & Sibal, Washington, D. C., of counsel), for petitioner.
 Laura V. Fargas, U. S. Dept. of Labor, Washington, D. C. (Carin A. Clauss, Sol. of Labor, Benjamin A. Mintz, Associate Sol. for Occupational Safety and Health, Allen H. Feldman, Counsel for Appellate Litigation, Charles I. Hadden, Asst. Counsel for Appellate Litigation, Washington, D. C., Albert H. Ross, Regional Sol., U. S. Dept. of Labor, Boston, Mass., of counsel), for respondents.
 Before FEINBERG, Chief Judge, and LUMBARD and MESKILL, Circuit Judges.
 MESKILL, Circuit Judge:
 
 
 1
 Petitioner, Pratt & Whitney Aircraft, Division of United Technologies Corporation (Pratt & Whitney), seeks review of a final order of the Occupational Safety and Health Review Commission (OSHRC or the Commission), holding the company in violation of the Occupational Safety and Health Act of 1970 (OSHA or the Act), 29 U.S.C. §§ 651-678 (1976), and certain regulations promulgated thereunder. The petition for review is granted in part and denied in part, and the case remanded to the Commission for further proceedings.
 
 A. The Regulatory Framework
 
 2
 This case presents the complex and often bewildering regulatory framework of OSHA. In this case, the Commission found that Pratt & Whitney had breached the "general duty" clause of the Act and had violated several of the regulations promulgated by the Secretary of Labor (the Secretary). See 29 C.F.R. §§ 1900-2000 (1980). The "general duty" provision, § 5(a)(1) of the Act, provides:
 
 
 3
 (a) Each employer
 
 
 4
 (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees.
 
 
 5
 29 U.S.C. § 654(a)(1) (1976). This section is intended as a catchall provision to cover dangerous conditions of employment not specifically covered by existing health and safety standards promulgated by the Secretary of Labor under the Act. See Morey, The General Duty Clause of the Occupational Safety and Health Act of 1970, 86 Harv.L.Rev. 988, 990 (1973). "To prove a violation of the general duty clause, 'the Secretary must prove (1) that the employer failed to render its workplace free of a hazard which was (2) recognized and (3) causing or likely to cause death or serious physical harm.' " Usery v. Marquette Cement Manufacturing Co., 568 F.2d 902, 909 (2d Cir. 1977) (quoting National Realty & Construction Co. v. OSHRC, 489 F.2d 1257, 1265 (D.C.Cir.1973)).
 
 
 6
 The violations in this case have been classified as both "serious" and "non-serious." Section 17(k) of the Act sets forth the requirements for a serious violation:
 
 
 7
 For purposes of this section, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists, or from one or more practices, means, methods, operations or processes which have been adopted or are in use, in such place of employment unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation.
 
 
 8
 29 U.S.C. § 666(j)(1976). Whether a violation of any of the health and safety standards promulgated by the Secretary may be deemed serious depends upon whether any accident that would result from the violation would present a substantial probability of death or serious physical injury. See Usery v. Hermitage Concrete Pipe Co., 584 F.2d 127, 131 (6th Cir. 1978); California Stevedore & Ballast Co. v. OSHRC, 517 F.2d 986, 988 (9th Cir. 1975); Brennan v. OSHRC (Interstate Glass Co.), 487 F.2d 438 (8th Cir. 1973). It would appear, however, that any condition at a place of employment that violates the general duty clause would have to be deemed serious, since an element of a general duty violation is that the condition is "likely to cause death or serious physical harm." There seems to be little distinction between "substantial probability" as employed in § 17(k) and "likely" as employed in § 5(a)(1). With this background in mind, we turn to the facts of the case.
 
 B. The OSHA Citations
 
 9
 In the spring of 1975, OSHA compliance officers inspected the Pratt & Whitney plant located in North Haven, Connecticut. More than 4,500 employees work at the facility, which has over one million square feet of manufacturing space. Citations were issued to Pratt & Whitney for two serious violations and several non-serious violations of the Act. Several of the citations for non-serious violations were set aside after a full hearing conducted before the administrative law judge, Abraham Gold. Judge Gold also vacated the citation issued to Pratt & Whitney for its serious violation of 29 C.F.R. § 1910.94(d) (7)(iii) (1980), a regulation which proscribes the use of a common exhaust system that poses a risk of fire, explosion, or hazardous chemical reaction. Judge Gold affirmed the citation issued to Pratt & Whitney for its serious violation of the general duty clause.
 
 
 10
 Both the Secretary and Pratt & Whitney appealed to the OSHRC for review of Judge Gold's decision. Moving at a glacial pace, the OSHRC rendered its decision three and one-half years after briefs were filed by the parties. The OSHRC reinstated the serious violation of 29 C.F.R. § 1910.94(d)(7)(iii) (1980) which had been vacated by Judge Gold, affirmed the citation for the serious violation of the general duty clause, and vacated several of the citations for non-serious violations.
 
 
 11
 Pratt & Whitney seeks review of the serious and non-serious violations affirmed by the OSHRC. The Secretary does not challenge the portions of the OSHRC's decision which vacated citations for several of the non-serious violations. For the purpose of clarity, we treat each of Pratt & Whitney's challenges to the citations separately.
 
 C. The General Duty Clause Violation
 
 12
 During the course of the inspections at the North Haven facility, OSHA compliance officers discovered that Pratt & Whitney was storing large quantities of acids and cyanides in a common, indoor, bulk-chemical storage area. The parties agree that, if acid were to come in contact with the cyanides, a lethal gas, hydrogen cyanide (HCN), would be formed. The storage shed was about 40 feet long and 32 feet wide, and was partitioned lengthwise by a very hard asbestos-like substance. The partition was approximately seven feet high, and atop of it there was a chain-link fence which extended to the ceiling of the storage shed. On one side of the partition, the wet-side, acids were stored; on the other, the dry-side, potassium cyanide and sodium cyanide pellets were stored. The storage shed had only one drain, which was located on the dry-side about two feet from the partition. About 1/4 inch of space was left between the bottom of the partition and the floor so that liquids could pass to reach the drain.
 
 
 13
 The petitioner's expert, Mr. Doyle, testified that the likelihood of HCN gas being formed was "very remote," because such an occurrence would require "a series of disconnected events." A. 437-38. Notwithstanding that several acid spills had in fact occurred, Mr. Doyle testified that it would take approximately one and one-half hours for the most corrosive acid stored in the shed to eat through the steel drums containing the cyanide compounds. Petitioner's expert also claimed that the drain would have to be plugged and two containers of acid would have to spill for the acid to reach the cyanides. Furthermore, Mr. Doyle noted that the otherwise readily detectable fumes of such an acid spill would have to go undetected for the length of time necessary for the acid to corrode the cyanide drum.
 
 
 14
 The Secretary's expert, Mr. Padden, testified that he had visited 300 to 400 plants which stored acids and cyanides and that he had observed only two that had used a common drain. He added that those two plants "corrected the situation immediately" after being urged to do so. Mr. Padden stated that all of the other plants he had seen had used separate storage areas and separate drains for acids and cyanides.
 
 
 15
 The OSHRC determined that the cited conditions amounted to a serious violation of the general duty clause, concluding that the formation of HCN in Pratt & Whitney's chemical storeroom was "reasonably foreseeable," and that feasible methods of abatement separately storing the chemicals with separate drains were available. The OSHRC also concluded that in the event of an accident, a likely consequence would be death or serious injury. Thus the Commission determined that Pratt & Whitney's violation of the general duty clause was a serious one under § 17(k) of the Act, 29 U.S.C. § 666(j) (1976). In a dissenting opinion, Commissioner Barnako agreed that the reasonable foreseeability of a hazardous incident is an element of a violation under the general duty clause, but concluded that, under the facts presented, the occurrence of a hazardous incident at petitioner's storeroom was not reasonably foreseeable.
 
 
 16
 The only issue presented in connection with this citation is whether the conditions at Pratt & Whitney's indoor chemical storage facility amounted to a "recognized hazard" within the meaning of § 5(a)(1) of the Act, 29 U.S.C. § 654(a)(1) (1976). We are convinced that much of the confusion in this case was generated by a failure on the part of the Secretary properly to define the "hazard" with which this citation is concerned. The Secretary has asserted from the outset that the recognized hazard it found at Pratt & Whitney's plant was "hydrogen cyanide formation." Of course, it cannot be denied that uncontrolled formation of HCN gas at a place of employment would constitute a recognized hazard within the meaning of § 5(a)(1). Indeed, petitioner concedes as much. However, there was not a scintilla of evidence that HCN had ever formed in petitioner's storeroom. Thus, the hazard evaluated at Pratt & Whitney's chemical storage area could not have been uncontrolled HCN gas formation, but rather must have been a condition that might result in the generation of that lethal gas. Because the Secretary defined the recognized hazard in terms of a potentiality, HCN formation, rather than the existing condition that might give rise to that potentiality, the manner in which the chemicals were stored, the parties found themselves debating over the relevance of the probability of a hazardous incident occurring at the petitioner's plant. Thus, Pratt & Whitney contends that the likelihood of HCN forming in its chemical storage area was too remote a possibility to support a violation of the general duty clause. The Secretary, on the other hand, asserts that since the hazard to be prevented HCN formation in and of itself constitutes a recognized hazard, all that had to be shown was that the condition under examination presented a possibility of its formation. The OSHRC apparently was uneasy about upholding a violation of the general duty clause where only a possibility of a hazardous incident occurring was demonstrated, since it imposed, without the urging of either party, a seemingly higher probability standard; as stated above, the Commission determined that the occurrence of a hazardous incident i. e., HCN formation in Pratt & Whitney's storeroom was "reasonably foreseeable." Although we conclude that the condition cited constituted a violation of the general duty clause, we arrive at this determination by a different route than that taken by the OSHRC and the Secretary.
 
 
 17
 Section 5(a)(1) of the Act obligates employers to rid their workplaces not of possible or reasonably foreseeable hazards, but of recognized hazards. The intent of the legislature may be gleaned from the plain language of the statute. "Recognized" is defined in Webster's Third New International Dictionary (unabridged 1971) as follows: "to recall knowledge of: make out as or perceive to be something previously known to perceive clearly: be fully aware of: REALIZE." (emphasis added). In short, the term "recognized" connotes knowledge. Thus, in Usery v. Marquette Cement Manufacturing Co., supra, 568 F.2d at 910, this Court stated that to "constitute a recognized hazard, the dangerous potential of a condition or activity must actually be known either to the particular employer or generally in the industry."
 
 
 18
 This definition is fully supported by the legislative history of the general duty clause. See Meeds, A Legislative History of OSHA, 9 Gonzaga L.Rev. 327, 346-47 (1974). The term "recognized hazard" is intended to cover dangerous conditions that can be detected by the human senses and are generally known as hazardous. See 116 Cong.Rec. 42206 (1970):
 
 
 19
 A recognized hazard is a condition that is known to be hazardous, and is known not necessarily by each and every individual employer but is known taking into account the standard of knowledge in the industry. In other words, whether or not a hazard is "recognized" is a matter for objective determination; it does not depend on whether the particular employer is aware of it.
 
 
 20
 116 Cong.Rec. 38377 (1970) (quoted in National Realty & Construction Co. v. OSHRC, supra, 489 F.2d at 1265 n.32). We find nothing in the legislative history of § 5(a)(1) to support an interpretation such as the Secretary's that any condition which presents a possibility of seriously injuring an employee constitutes a recognized hazard within the meaning of that section.
 
 
 21
 The Secretary relies upon a number of cases decided in this Circuit and elsewhere which hold that an accident need only be possible, not probable, to support a violation of the general duty clause, see Babcock & Wilcox Co. v. OSHRC, 622 F.2d 1160, 1165 (3d Cir. 1980); see also Titanium Metals Corp. of America v. Usery, 579 F.2d 536, 541 (9th Cir. 1978); Usery v. Marquette Cement Manufacturing Co., supra, 568 F.2d at 910; Dunlop v. Rockwell International, 540 F.2d 1283, 1289-90 (6th Cir. 1976); Brennan v. OSHRC (Underhill Construction Corp. ), 513 F.2d 1032, 1039 (2d Cir. 1975), and concludes that the occurrence of a hazardous incident that could cause injury need only be possible as well.[1] But under the Secretary's interpretation of the term "recognized" as it is used in § 5(a)(1), an employer could be held liable notwithstanding that neither he nor any responsible member of his industry knew or could have known of the potential danger of a condition or activity, so long as there existed a plausible, theoretical possibility that the condition or activity could cause an employee to incur serious injury. Under such a standard, it would seem that whenever the occurrence of an incident capable of causing an employee serious injury is not impossible, an employer is in violation of § 5(a)(1). However, we do not believe that Congress intended the term "recognized" to be so broadly construed. Moreover, although the OSHRC's "reasonably foreseeable" formulation might generally embrace hazards that are recognized in an industry,[2] there is a vast difference between what is known or recognized and what is reasonably foreseeable.[3]
 
 
 22
 As we stated in Usery v. Marquette Cement Manufacturing Co., supra, to be a recognized hazard, the dangerous potential of the condition or activity being scrutinized either must be known by the employer or known generally in the industry. Applying the appropriate standard avoids completely the task of speculation about probabilities of hazardous incidents occurring. Therefore, the burden was on the Secretary in this case to show that the manner in which Pratt & Whitney stored its chemicals was known by it to be hazardous or was generally recognized as such by the industry. Irrespective of the improper standard advanced by the Secretary, we are satisfied that the record contains substantial evidence to sustain a violation of the general duty clause under the Marquette standard. Mr. Padden's testimony that only two of the 300 to 400 plants he had visited had employed common drains, and that those two had corrected the situation immediately when advised, permitted the inference that the industry generally stored acids and cyanides separately with separate drains to guard against the formation of HCN gas in storage areas. Since the record reveals substantial evidence, 29 U.S.C. § 660(a), (b) (1976), that the industry generally recognized as hazardous the manner of storing chemicals utilized by Pratt & Whitney, the general duty clause violation must be affirmed. See generally NLRB v. United Insurance Co., 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); Usery v. Marquette Cement Manufacturing Co., supra, 568 F.2d at 910.
 
 
 23
 D. The Serious Violation Involving Common Ductwork
 
 
 24
 At its North Haven plant, Pratt & Whitney maintains an exhaust system that provides separate exhaust ducts over the various open tanks of cyanide, heated slushing oil, hydrogen peroxide, and glacial acetic acid used in its plating operations. The individual exhaust ducts have chimney-like "plenums" that are connected to a common duct for each of the plant's seven plating lines. Each of the seven common ducts feeds exhaust through a stack in the roof. Relying on 29 C.F.R. § 1910.94(d)(7)(iii) (1980),[4] which prohibits the use of common exhaust systems where a combination of the vented substances "may constitute a fire, explosion, or chemical reaction hazard," the Secretary cited the company for a serious violation.
 
 
 25
 In connection with all seven plating lines, the Secretary contends that acid mists and cyanide mists could combine in the common duct to form HCN gas, a serious hazard to the employees. The Secretary asserts that the gas, if formed, conceivably could asphyxiate employees on the roof, or in the plant itself if a downdraft returned it inside the plating department. Additionally, the Secretary claims that cyanide gas in the ducts would pose a serious fire or explosion hazard because of the low flash point of that vapor.
 
 
 26
 The Secretary also contends with respect to one of the plating lines that hydrogen peroxide and heating oil could combine in a common duct and create the potential for fire or explosion. Another possibility, according to the Secretary, is that the hydrogen peroxide could react with acetic acid in the common duct to form peracetic acid which also could create the risk of fire or explosion. For the latter to occur, the Secretary concedes that the ventilation system would have to malfunction, but notes that the system actually did break down during the OSHA inspection.
 
 
 27
 The Secretary argues that the plating industry recognizes that use of common exhaust systems for these chemicals is hazardous; that the practice in the industry is to vent these chemicals separately; that its own expert testified that the ventilation system constituted a hazard; and that Pratt & Whitney permitted cigarette smoking in the plating department, thus enhancing the danger of a fire or an explosion.
 
 
 28
 With respect to HCN formation, Pratt & Whitney points out that the OSHA compliance officer did not make any tests to detect the presence of HCN at any of the locations where it was alleged that the gas could form. Petitioner, however, tested for HCN concentration at each of the seven stacks on the roof, and not a trace of HCN was detected. The testing device, according to petitioner's employee, Mr. Dunstan, was sensitive to one-hundredth of the acceptable exposure limit of HCN. Tests were also performed to determine whether HCN was being formed in the common ducts as alleged. These tests also proved to be negative. Contrary to the contention of the Secretary, the company's expert witness, Mr. Doyle, testified before Judge Gold that he had seen plating lines in different companies that used common ducts and individual duct systems. Mr. Doyle testified that the results of the tests performed by the company's employee, Mr. Dunstan, were satisfactory. He concluded that the common duct system posed no hazard of HCN formation. In connection with the Secretary's allegation that heated oil mists or acetic acid could combine in the ducts with hydrogen peroxide vapors and create a hazard of fire or explosion, Mr. Dunstan concluded that such a reaction "will not likely occur." Jt.App. 478-80.
 
 
 29
 After a full administrative hearing, Judge Gold set aside the citation. Judge Gold stated:
 
 
 30
 Complainant's evidence does not demonstrate the existence of hydrogen cyanide gas or peracetic acid in the common duct system. It does not establish that the hydrogen peroxide and slushing oil combine in the common duct. The Secretary has presented textbook theory, without obtaining readily available information which would show whether there existed at Respondent's facility those specific conditions required for the creation of a fire, explosion, or chemical reaction hazard. He has offered nothing more than conjecture. In addition, he suggests that a hazard might arise by virtue of a ventilation breakdown, malfunction of the heating systems for the various solutions, spontaneous combustion caused by mechanical failure, a down-draft of effluent or "by some yet unimagined happening." We have no showing of any reasonable likelihood of such mishaps; the Secretary might just as well have suggested the possibilities of arson or insurrection.
 
 
 31
 Jt.App. 50.
 
 
 32
 Despite the emphatic language employed by Judge Gold in his opinion setting aside this violation, the OSHRC reversed, stating:
 
 
 33
 Section 1910.94(d)(7)(iii) is violated whenever the same exhaust system is used to remove two or more substances, when either one or a combination of the substances may constitute a fire, explosion or chemical reaction hazard in the duct system. The use of the word "may" makes it clear that a violation is established whenever a hazardous combination of the substances is possible. It is not necessary to prove that the chemical reaction is reasonably likely or that the prohibited hazards actually threaten employees at the time of the inspection. The standard is directed toward the control of possible or potential hazards. Cf. Brennan v. OSHRC (Underhill Construction Corp.), 513 F.2d 1032, 1039 (2d Cir. 1975).
 
 
 34
 Jt.App. 81 (emphasis in original). The OSHRC determined that the evidence proffered by the Secretary demonstrated "the realistic possibility" both that HCN could be formed and that fire or explosion could result from a reaction in the duct of heated oil and either hydrogen peroxide or peracetic acid. The Commission concluded that "(d)espite the relatively low likelihood of an incident, a large number of employees could be immediately exposed if an incident occurred (and) the consequences of employee exposure would be severe." Jt.App. 83.
 
 
 35
 Pratt & Whitney does not dispute that an occurrence of the hazardous reactions in its common duct system might be "possible." However, it is argued that a mere possibility that a chemical reaction might occur in its duct system is insufficient to support a violation of the safety regulation involved. Since there is no question that substantial evidence supports the OSHRC's determination under a "possibility" standard, our inquiry is limited to determining whether the OSHRC's interpretation of § 1910.94(d)(7)(iii) is valid.
 
 
 36
 In Brennan v. OSHRC (Gerosa, Inc.), 491 F.2d 1340, 1344 (2d Cir. 1974), this Court stated that in cases such as this
 
 
 37
 our role is to decide whether the Commission's interpretation of the Regulation is unreasonable and inconsistent with its purpose, the normal standard for review of the interpretation of a regulation by the agency charged with its administration.
 
 
 38
 Id. at 1344 (citations omitted). While it is far from unreasonable to interpret the term "may" as connoting mere possibility, and while such an interpretation would indubitably be consistent with the regulation's purpose, an agency may not interpret a regulation in a manner that enlarges its scope beyond that of the enabling act under which it was promulgated. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976).
 
 
 39
 In a plurality decision, the Supreme Court stated in Industrial Union Department, AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 100 S.Ct. 2844, 65 L.Ed.2d 1010 (1980) ("Benzene " case), that OSHA
 
 
 40
 was not designed to require employers to provide absolutely risk-free workplaces whenever it is technologically feasible to do so, so long as the cost is not great enough to destroy an entire industry. Rather, both the language and structure of the Act, as well as its legislative history, indicate that it was intended to require the elimination, as far as feasible, of significant risks of harm.
 
 
 41
 448 U.S. at 641, 100 S.Ct. at 2864. The Court placed principal reliance upon § 3(8) of the Act, 29 U.S.C. § 652(8) (1976),[5] in reaching this conclusion, stating:
 
 
 42
 By empowering the Secretary to promulgate standards that are "reasonably necessary or appropriate to provide safe or healthful employment and places of employment," the Act implies that, before promulgating any standard, the Secretary must make a finding that the workplaces in question are not safe. But "safe" is not the equivalent of "risk-free." There are many activities that we engage in every day such as driving a car or even breathing city air that entail some risk of accident or material health impairment; nevertheless, few people would consider these activities "unsafe." Similarly, a workplace can hardly be considered "unsafe" unless it threatens the workers with a significant risk of harm.
 
 
 43
 Therefore, before he can promulgate any permanent health or safety standard, the Secretary is required to make a threshold finding that a place of employment is unsafe in the sense that significant risks are present and can be eliminated or lessened by a change in practice.
 
 
 44
 448 U.S. at 642, 100 S.Ct. at 2864. Thus, the Benzene case clearly teaches that the Act is intended only to guard against significant risks, not ephemeral possibilities. It follows that § 1910.94(d)(7)(iii) can properly be interpreted as proscribing an employer's use of a common exhaust system only where there exists a "significant risk" that a combination of the substances removed will cause a fire, explosion, or chemical reaction hazard. The risk must be something more than a mere possibility. The term "possible" can embrace anything that falls "within the bounds of what may occur within the framework of nature." Webster's Third New International Dictionary, supra. The occurrence of a freakish event constitutes a possibility, but we believe, especially in light of the Supreme Court's decision in the Benzene case, that safety standards may not be so broadly interpreted so as to embrace such slight risks of harm. We are convinced that the test employed by the OSHRC that "a violation is established whenever a hazardous combination is possible" would permit this safety standard to be applied to conditions posing insignificant risks that are beyond the scope of the Act. Thus, the decision of the OSHRC concerning this violation must be set aside.
 
 
 45
 That the OSHRC employed an improper test in determining whether the conditions cited at Pratt & Whitney violated § 1910.94(d)(7)(iii), however, does not necessarily dictate the conclusion that the cited conditions did not violate that provision. Indeed, although the OSHRC utilized a "possibility" standard, its factual finding was that the Secretary had demonstrated the "realistic possibility" that the dangerous condition might occur, Jt.App. 81. At first blush, the distinction between what is significant and what is realistically possible seems to be too subtle to perceive, let alone a sufficient basis to warrant remanding this action. However, the fact remains that the standard employed by the OSHRC was too broad and the use of the term "realistic" in its factual finding may well have been mere surplusage. We think that this ambiguity is sufficient cause to vacate and remand. The OSHRC on remand may conclude that the risk of an explosion, fire, or chemical reaction hazard in Pratt & Whitney's ductwork was, indeed, significant. This decision is best left to the OSHRC in the first instance. It is the agency, not the courts, that possesses the required expertise to make such decisions. Marshall v. Cities Service Oil Co., 577 F.2d 126, 130 (10th Cir. 1978).
 
 
 46
 Based on the record before us, we cannot predict whether the OSHRC will conclude that the common ductwork at Pratt & Whitney's plant poses a significant risk of fire, explosion, or dangerous chemical reaction in violation of § 1910.94(d)(7)(iii). We feel compelled to point out, however, that implicit in the opinion of the ALJ is a determination that the Secretary failed to establish even the remotest possibility of such mishaps occurring. Judge Gold opined that "the Secretary might just as well have suggested the possibilities of arson or insurrection." Jt.App. 50. Clearly, Judge Gold would have held, under the appropriate test, that the Secretary failed to carry his burden of proof that the ductwork in petitioner's plating department posed a significant risk of a hazardous incident. In remanding this action we are constrained to remind the OSHRC that the burden of proof was upon the Secretary to demonstrate the violation by a preponderance of the evidence, Olin Construction Co. v. OSHRC, 525 F.2d 464, 466 (2d Cir. 1975) (per curiam). That the scope of review available to the courts to scrutinize such agency determinations is strictly limited by the substantial evidence test in no way relieves the OSHRC of its obligation to determine whether the Secretary has established alleged violations of OSHA health or safety standards by a preponderance of the proof. Moreover, while the OSHRC is not bound to accept the factual findings of the ALJ, the latter's determinations are entitled to some weight and should not be disturbed without explanation. ITT Continental Baking Co., Inc. v. FTC, 532 F.2d 207, 219 (2d Cir. 1976). As Judge Lumbard stated in NLRB v. Interboro Contractors, Inc., 388 F.2d 495, 499 (2d Cir. 1967):
 
 
 47
 (T)he Board's supporting evidence, in cases where it rejects the examiner's findings, must be stronger than would be required in cases where the findings are accepted, since in the former cases the supporting evidence must be deemed substantial when measured against the examiner's contrary findings as well as the opposing evidence.
 
 
 48
 Indeed, the Supreme Court in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), indicated that the reviewing commission of an agency should show at least some deference to the factual findings of the ALJ:
 
 
 49
 We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The "substantial evidence" standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion.
 
 
 50
 340 U.S. at 496, 71 S.Ct. at 468. In arriving at its determination that the ductwork of petitioner's plant posed a possibility that a hazardous event might occur, the OSHRC relied upon the "textbook theory" rejected by Judge Gold. Additionally, the OSHRC noted that the Secretary's expert, Mr. Padden, had not recalled seeing similar ductwork in the "100 or so" other plating departments he had visited. The latter testimony, however, conflicted with that of petitioner's expert, Mr. Doyle, who testified that of the plants he had visited, "some had individual ducts over the plating baths, and others had common ducts." Furthermore, petitioner conducted scientific tests which revealed not a trace of the dangerous substances that the Secretary claimed might form.[6] On remand, the OSHRC is obligated to weigh carefully all of the latter evidence in determining whether the Secretary has demonstrated by a preponderance of the evidence that the common ductwork at petitioner's plant violated § 1910.94(d)(7)(iii). Again, we express no view as to the proper outcome of this reconsideration; our concern is rather to assure that all the evidence is given appropriate weight and that the conclusion reached is adequately supported by a reasoned explanation.
 
 
 51
 The citation for this violation is set aside and remanded to the Commission for further proceedings consistent with this opinion.
 
 E. The Non-Serious Violations
 
 52
 Petitioner seeks review of several non-serious violations for which it was cited. We find that only one of these merits discussion. At the heat treatment department in petitioner's North Haven plant, small metal parts are moved to and from a heating furnace on a contraption called a "spider." (See illustration in appendix). The spider consists of four circular trays arranged vertically on an axle. It weighs approximately 875 pounds and is about six feet tall. The spider hangs from the hook of an overhead crane, and is lifted about 4 1/2 feet when being moved. Thus, while in motion, the top tray of the spider is about 10 1/2 feet from the ground. A single employee stands about 2 1/2 feet from the spider while it is moving. Each of the trays on the spider is bordered by a one inch lip to keep the small metal parts from falling.
 
 
 53
 The OSHA compliance officer cited petitioner for a violation of 29 C.F.R. § 1910.132(a) (1980), which requires necessary protective equipment for jobsite hazards, for failing to provide the operator of the spider with a hard hat. The OSHRC affirmed the violation, finding that "the employee was exposed to the hazard of parts falling on his head from the higher trays." Jt.App. 91-92.
 
 
 54
 Pratt & Whitney contends, as it did below, that the manner in which the spider was operated did not present a hazard to the employee operating it. The company claims that it was unreasonable for the OSHRC to conclude that metal parts could somehow be propelled off a tray of the spider over the one inch lip, travel over 2 1/2 feet horizontally in the air, and strike an operator in the head. Petitioner notes that the tremendous weight of the spider makes it very difficult to jostle and points out that it travels at only 1 1/2 miles per hour. Pratt & Whitney also claims that the Secretary offered absolutely no evidence to show under what circumstances the spider could be jostled other than the bare allegation that it could run into another employee.
 
 
 55
 Section 1910.132(a) provides in pertinent part:
 
 
 56
 Protective equipment, including personal protective equipment for eyes, face, head, and extremities shall be provided, used, and maintained wherever it is necessary by reason of hazards or processes or environment
 
 
 57
 29 C.F.R. § 1910.132(a) (1980). "To impart the requisite specificity to this provision, courts, construing it have implied a general 'reasonableness' standard." American Airlines, Inc. v. Secretary of Labor, 578 F.2d 38, 41 (2d Cir. 1978). The test adopted by this Circuit in the American Airlines case requires the OSHRC to determine whether a reasonable man familiar with the conditions of the industry would have instituted the protective measure which the Commission claims the alleged violator failed to implement. Our decision in American Airlines antedated the OSHRC's order in this case by almost two years; yet, the Commission nevertheless failed to make the required finding. We cannot, on the basis of the record before us, determine as a matter of law what result should be reached on that issue. The order of the OSHRC affirming the violation of § 1910.132(a) is vacated and remanded for proceedings consistent with this opinion.
 
 Summary
 
 58
 The citation for the serious violation of the general duty clause is affirmed. The citations for violations of §§ 1910.94(d)(7)(iii) and 1910.132(a) are vacated and remanded for further proceedings consistent with this opinion. The remainder of the citations for the non-serious violations are affirmed. Each party shall bear its own costs.APPENDIX
 
 
 59
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 None of these cases stands for the proposition that the occurrence of the dangerous condition itself need only be possible. Indeed, in cases in which this Circuit has construed § 5(a)(1), the occurrence of the hazardous incident involved was far from a mere possibility. In Usery v. Marquette Cement Mfg. Co., supra, for example, the hazardous incident was the employer's reckless practice of dumping bricks and debris into an unguarded alleyway without warning. 568 F.2d at 910. The hazard, falling bricks, manifested itself through a continuing course of conduct. Although the recurrence of a similar employee accident may have been merely a possibility, the probability that bricks would continue to fall was a certainty
 
 
 [2]
 We note in passing that, at a minimum, a violation must be reasonably foreseeable for it to be deemed a serious violation. Section 17(k), 29 U.S.C. § 666(j) (1976), provides that if "the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation," the violation cannot be deemed a serious one
 
 
 [3]
 We dismiss as dictum the language employed by the Third Circuit in Babcock & Wilcox, supra, 622 F.2d at 1164, to the effect that a recognized hazard is one that is reasonably foreseeable
 
 
 [4]
 Section 1910.94(d)(7)(iii) provides in pertinent part:
 (7) System Design
 (iii) Two or more operations shall not be connected to the same exhaust system where either one or the combination of the substances removed may constitute a fire, explosion, or chemical reaction hazard in the duct system. Traps or other devices shall be provided to insure that condensate in ducts does not drain back into any tank.
 
 
 [5]
 Section 3(8) of the Act, 29 U.S.C. § 652(8) (1976) provides:
 (8) The term "occupational safety and health standard" means a standard which requires conditions, or the adoption or use of one or more practices, means, methods, operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment.
 
 
 [6]
 At oral argument, Pratt & Whitney pointed out that in the five years since the company was cited for this violation no explosion, fire, or chemical reaction hazard had occurred