**FAULTLESS DIVISION, BLISS & LAUGHLIN INDUSTRIES, INC., a corporation, Petitioner,**

v.

**SECRETARY OF LABOR, and Occupational Safety and Health Review Commission, Respondent.**

No. 81-1740.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1982.

Decided March 30, 1982.

Thomas O. Magan, William Michael Schiff, Kahn, Dees, Donovan & Kahn, Evansville, Ind., for petitioner.

Andrea C. Casson, U. S. Dept. of Labor, Washington, D. C., for respondent.

Before PELL, Circuit Judge, FAIRCHILD, Senior Circuit Judge and CUDAHY, Circuit Judge.

CUDAHY, Circuit Judge.

Petitioner Faultless Division, Bliss & Laughlin Industries, Inc. ("Faultless") seeks judicial review of an order of the Occupational Safety and Health Review Commission ("Commission" or "OSHRC") citing

Faultless for failing to guard certain presses. On December 4 and 5, 1979, a compliance officer from the Occupational Safety and Health Administration ("OSHA") inspected Faultless' rubber molding operations. As a result of this inspection, Faultless was cited for a serious violation of 29 C.F.R. § 1910.212(a)(3)(ii) (1980), for failing to guard the point of operation on 17 hydraulic rubber molding presses. The Secretary established an abatement date and assessed a corrected penalty of $560 (later reduced to $100). Faultless contested the citation and the Commission assigned the case to an Administrative Law Judge ("ALJ"). The ALJ upheld the citation.

Faultless here petitions for review of the ALJ's decision and order, which became the Commission's final order on March 25, 1981, when no Commissioner granted Faultless' petition for discretionary review. *See* 29 U.S.C. § 666(i) (Supp. II 1978). In its petition, Faultless asserts that the Commission's final order lacks substantial evidentiary support, is based upon an unconstitutionally vague regulation and wrongfully imposes upon it the burden of proving infeasibility of compliance. We deny Faultless' petition and affirm the Commission's order.[1]

## I.

Faultless manufactures small rubber caster wheels at its plant in Evansville, Indiana. As part of its manufacturing process, Faultless operates 17 hydraulic rubber molding presses. These presses employ both pressure and heat to form small rubber "preforms" into wheel-shaped casters. There are two types of presses at the plant arrayed along two separate production lines. Line A contains twelve "French-type" hydraulic rubber molding presses; Line B contains five "clam shell" hydraulic rubber molding presses. The two types of presses are similar in structure and opera-

tion except that the French-type is a two-sided press requiring two operators to simultaneously load and operate the press, while the clam shell presses need only one operator loading from one side.

Operators load the press dies while standing at the side of the press on a work platform. Line B operators pull a mold out of the clam shell press, insert the rubber preforms in the mold, and then close the mold and push it back into the press. Line A operators, however, push sheets containing the preforms directly into the French-type press. The preforms are held in place on the sheets by a jig board located on top of the sheet. After inserting the sheet and jig board, the operators pull the sheet out of the press and then shake the board to position the preforms on guiding pins. The operators then pull the jig board out of the press and the preforms drop into the molding cavities. Unlike the Line B clam shell operation, the mold used on Line A is not closed outside the press; instead, the mold remains stationary (positioned inside the press) and the die with exposed preforms is lifted upward against the stationary mold by the action of the closing press.

On both lines, after the preforms are loaded into the press, the operator activates the press by depressing a momentary-contact start button located near the press opening. (The paired Line A operators must simultaneously depress the start buttons located on the two sides of the press.) Immediately after depressing the start button (or buttons), the ram of the press in question lifts hydraulically upward, closing the gap or opening which exists at the point of operation. Depending upon the thickness of the die, the opening at the point of operation for Line B presses varies from three to seven inches in height and the time taken for the ram to close is approximately seven seconds.

---

1. Consolidated with this petition for review was Faultless' motion to stay the Commissioner's order pending appellate review. On September 23, 1981, we issued an order staying enforcement of the Commission's order. Because we now deny Faultless' petition on the merits, our prior order staying enforcement is hereby dissolved. The Commission shall, upon the Secretary's motion, establish a new date by which Faultless must correct the defective condition.

The opening at the point of operation for Line A presses varies from seven to eleven inches in height and closing is completed in approximately ten seconds. After a press is closed, a curing cycle begins (during which the press remains closed). This cycle varies in duration from 10 to 45 minutes. When curing is completed, an automatic timer releases the press ram, the opening at the point of operation reappears and the finished wheel casters are ready for unloading. The press operators move from press to press, alternately loading and unloading the presses as time permits.

The OSHA compliance officer found no guarding device on the presses at the time of his inspection. The only safety device presently guarding the presses is a single emergency stop button. The activation of the stop button releases the hydraulic pressure, permitting the press ram to descend to the press base and restoring the opening at the point of operation. This button is located approximately six feet above the work platform on the upper left side of the press.

Faultless disputes the ALJ's findings of fact pertaining to the operators' behavior after they activate the presses. Based upon the testimony of a former Faultless production supervisor (La Mar), the ALJ found that press operators often reach into the press mold area during the closing cycle to realign preforms, thereby attempting to prevent the molding of imperfect caster wheels and reducing the potential for damage to the press. Given this reaching into

the press mold area, if the operator should be unable to remove his hand or arm before the ram completed its closing cycle, his limb would be crushed or amputated by the powerful thrust of the press ram. The ALJ foresaw an increased possibility of such an unfortunate accident resulting from Faultless' work rule requiring operators to wear long-sleeved shirts; an operator wearing long sleeves might entangle his shirt in the numerous recessed pins and guidepins inside the press mold. La Mar also testified that an operator who entangled his left arm shirt sleeve in the mold probably could not reach the emergency stop button located on the upper left side of the press with his free right hand. The ALJ made a finding, which Faultless challenges, that press operators stand near the presses and watch the seven to ten second closing cycle before walking to the next press.

After hearing the evidence adduced by both parties, the ALJ concluded that Faultless failed to guard its hydraulic rubber molding presses as required by 29 C.F.R. § 1910.212(a)(3)(ii) (1980).[2] The ALJ also concluded that this failure constituted a serious violation of the Occupational Safety and Health Act (the "OSH Act").[3] On this petition for review, Faultless reiterates its arguments raised before the ALJ together with several new contentions. Because of the unique factual setting of this case and some apparent misconceptions about the applicable law, we shall discuss each of Faultless' contentions in detail.

---

2. The regulation provides:

§ 1910.212 General requirements for all machines.

(a) *Machine guarding*—(1) *Types of guarding.* One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are—barrier guards, two-hand tripping devices, electronic safety devices, etc.

\* \* \* \* \* \*

(3) *Point of operation guarding.* (i) Point of operation is the area on a machine where work is actually performed upon the material being processed.

(ii) The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards therefor, or in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.
29 C.F.R. §§ 1910.212(a)(1), (3) (1980).

3. A serious violation occurs when "there is a substantial probability that death or serious physical harm could result from a condition which exists ... unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." 29 U.S.C. § 666(j) (1976).

## II.

Faultless contends that the ALJ's findings (which were, of course, adopted by the Commission) lack substantial evidentiary support in the whole record. As one branch of this contention, Faultless asserts that the ALJ's alleged preconception of the merits precluded him from rendering an impartial and objective decision. Moreover, Faultless claims that the ALJ improperly relied on the testimony of an admittedly biased witness and that other factual findings contradict Faultless' unrebutted testimony and evidence.

■ Our standard of review of the ALJ's findings of fact is provided by the OSH Act. Thus, section 11(a) of the OSH Act, 29 U.S.C. § 660(a) (1976), provides that "[t]he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." Although this standard does not permit or require us to rubber stamp Commission findings, we are clearly required to accept the ALJ's (and by adoption, the Commission's) reasonable and substantial findings of fact and the inferences drawn by the Commission from these findings. *See International Harvester Co. v. OSHRC*, 628 F.2d 982, 986–87 (7th Cir. 1980); *RMI Co. v. Secretary of Labor*, 594 F.2d 566 (6th Cir. 1979). Further, under the applicable standard, the ALJ's credibility determinations must be honored by the agency and by a reviewing court unless these determinations are contradicted by

uncontrovertible evidence. *International Harvester*, 628 F.2d at 986. Finally, our review of the ALJ's findings is premised upon an understanding of the OSH Act's remedial purpose and broad scope. *See* 29 U.S.C. § 651 (1976); *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 11-12, 100 S.Ct. 883, 890–91, 63 L.Ed.2d 154 (1980); *Bratton Corp. v. OSHRC*, 590 F.2d 273, 276 77 (8th Cir. 1979).

In connection with its challenge to the Commission findings, Faultless directs our attention to several parts of the record which, in its opinion, demonstrate the ALJ's bias against Faultless. Thus as part of its case, Faultless offered into evidence a video tape display of a French-type hydraulic rubber molding press in operation. At the time of this offer, the ALJ told Faultless' counsel that he was familiar with the machine in question and indicated to counsel that the display was not necessary.[4] Faultless points out that, before the colloquy about the tape, the ALJ denied a motion by Faultless to dismiss the citation, relying on an earlier case which had allegedly been decided by the ALJ.[5] Additionally, Faultless asserts that the ALJ's bias is demonstrated by his crediting of the testimony of Faultless' former supervisor, La Mar. An admittedly biased witness,[6] La Mar testified that he personally observed press operators reach into the press to straighten misaligned parts as the ram ascended. Faultless contends that its witnesses contradicted La Mar's testimony and thus, the ALJ improperly credited biased evidence.

---

4. Mr. Magan [Counsel for Petitioner]: Okay. Let's show you now, we have here a video tape which I'll show you.

 Judge Dixon [ALJ]: Will it bust it up if we shut it off? Will it break your continuity? It don't bother me because I've seen it before.

 Mr. Magan: Not really. I think we can kind of move through the thing. Well, I hope that you're going to look carefully at this. This may not be—

 Judge Dixon: There's an old expression, "I've been there", Mr. Magan.

 Mr. Magan: Not one of these presses is guarded in the whole industry, as far as I know, of this type. Can you see all right, counsel? At this time we're going to show a video tape.

 Transcript at 72–73.

5. Contrary to Faultless' claim in its brief, the ALJ in the instant case *did not* decide either of the cases he relied upon in denying the motion to dismiss. Nor did the ALJ claim during the hearing that the precedents he relied upon for denying the motion were cases that he had previously heard and decided. *See Caterpillar Tractor Co.*, 1980 Occ.Saf. Health Dec. ¶ 24,708 (ALJ); *Richardson Co.*, 1979 Occ.Saf. Health Dec. ¶ 23,721 (ALJ).

6. Faultless employed La Mar for 16½ years until he was terminated for unsatisfactory work performance in October, 1979. It is undisputed that the OSHA inspection leading to this compliance order was precipitated by La Mar's complaint filed at a local OSHA office.

We are unpersuaded by Faultless' arguments. Although an ALJ's bias may be grounds for overturning factual determinations, *see Medline Industries, Inc. v. NLRB*, 593 F.2d 788, 795 (7th Cir. 1979) (dicta), the evidence does not in fact raise any substantial doubt about the ALJ's impartiality in this case. Mere familiarity with legal or factual issues involved in a particular case does not, in itself, evince an adjudicator's biased predisposition. *See United Steelworkers of America v. Marshall*, 647 F.2d 1189, 1208–09 (D.C.Cir.1980), *cert denied sub nom. Lead Industries Association v. Donovan*, 453 U.S. 913, 101 S.Ct. 3148, 3149, 69 L.Ed.2d 997 (1981). Likewise, we are unpersuaded that the ALJ's denial of Faultless' motion to dismiss, relying upon previous decisions, which Faultless erroneously argued were heard and decided by the same ALJ, demonstrates an unacceptable preconception of the merits of this case. If we should accept Faultless' argument, even an unarguably even-handed administrative adjudicator could be taxed with bias merely for relying on his own prior decisions. Here we believe that the ALJ's comments about the video tape display were intended simply to avoid wasting valuable hearing time. The ALJ's attitude does not demonstrate bias against Faultless or its point of view.

We also reject Faultless' contention that the ALJ exhibited bias by crediting La Mar's testimony. The ALJ carefully considered La Mar's bias when assessing this evidence. No one directly contradicted La Mar's crucial observation that operators actually placed their hands inside the presses during the closing cycle. Faultless' witnesses (who are also at least potentially susceptible to charges of bias) merely noted that they had never personally observed an operator place his hand inside a press.[7] The OSHA compliance officer also testified that operators could reach into a closing press, although he did not observe any operator reach into a closing press during his compliance inspection. Finally, the ALJ carefully compared all of La Mar's testimony with the testimony given by Faultless' witnesses, finding that there were no material contradictions between the two sets of testimony. Under such circumstances, we cannot find error based on a demonstration of bias.[8]

As noted above, apart from its allegation of bias, Faultless attacks the ALJ's factual findings as lacking substantial evidentiary support in the record. According to Faultless, the ALJ's finding that the press operators would stand at their work platforms, after activating the press closure cycle, to observe their presses close contradicts the unrebutted testimony of Faultless' witnesses. Moreover, the ALJ allegedly ignored the testimony of Faultless' witnesses who claimed that the operators realigned any misplaced rubber preforms *before* activating the press. These findings are crucial because Faultless argues that the operators habitually walked over to the press next in line *immediately* after activating the closure cycle and, thus, were not in a position to extend their hands into the closing press.

The ALJ's findings with respect to these matters are supported by substantial evidence. Faultless does not refer us to

---

7. Moreover, we do not believe that the ALJ would, in this case, be forced to choose as representing the only acceptable truth either the testimony of La Mar or of the Faultless witnesses. Given the existing plant rule prohibiting operators from placing their hands inside the presses, it is reasonable to assume that operators might carefully avoid violating this rule in the presence of Faultless' personnel and production supervisors but be less careful in the presence of a line foreman (La Mar), with whom they dealt every day.

8. Faultless' reliance on *Medline Industries, Inc. v. NLRB*, 593 F.2d 788 (7th Cir. 1979), is mis-

placed. The *Medline* court did not overturn the ALJ's credibility findings because of any alleged bias attributable to the ALJ. Rather, the court noted that bias could have been an issue in that case because the ALJ had uniformly declined to believe every employer witness. But the court did not reach the issue of bias, since it held that the ALJ's factual determination could not stand when uncontroverted testimony was rejected solely on the grounds of disbelief. The instant case is, however, quite distinguishable because the ALJ did not flatly reject any uncontradicted evidence.

any definitive statement by a Faultless witness to the effect that the operators never stood near the presses to observe the relatively short seven to ten second closing cycle. Nor does our own review of the record disclose such a statement. Faultless' witnesses merely testified that, as part of their prescribed production method, operators were expected to move "immediately" to the next press. Absent any clear rebuttal of La Mar's claim that operators did stand and observe the presses close, we cannot conclude that this finding is unsupported by substantial evidence. Further, we think that Faultless' argument probably belies typical human behavior in a factory. An experienced factfinder might question Faultless' attempt to persuade him that its press operators, in their zeal to meet production schedules, raced from press to press, never stopping to pause for a few seconds as the press closed. A more credible view, as the ALJ inferred from this record, is that a press operator on occasion might watch the press close to insure that nothing went wrong before the curing cycle began.

Likewise, we conclude that the ALJ's finding that press operators would reach into closing presses to realign rubber preforms is supported by substantial evidence. Obviously, safety-conscious operators would, as Faultless' witnesses testified, make every effort to realign the preforms *before* activating the press. Faultless' witnesses, however, testified only that they never *observed* an operator place his hand inside a closing press. Obviously, Faultless does not assert that operators *could not* as a matter of fact place their hands inside a closing press. La Mar, on the other hand, testified that, based on over sixteen years of day to day experience working with these machines and their operators, he personally observed operators place their hands inside a press as it closed.

 Finally, we note that substantial evidence, considering the whole record, supports the ALJ's conclusion that Faultless committed a serious violation of the machine guarding regulation. The Secretary's regulation requires that "[t]he point of operation of machines whose operation exposes an employee to injury, shall be guarded." 29 C.F.R. § 1910.212(a)(3)(ii) (1980). It is undisputed that Faultless' hydraulic rubber molding presses were unguarded. Nor does Faultless contend that an operator's hand or arm would not be crushed or amputated if the press ram closed on it or that an operator is physically incapable of reaching into a closing press.[9] Citing its commendable history of there having been no serious accidents involving these presses,[10] Faultless argues that the unguarded presses are not a safety hazard. Although the absence of accidents is entitled to great weight, this fact alone is not dispositive of the question whether a violation has occurred. *A. E. Burgess Leather Co. v. OSHRC*, 576 F.2d 948, 951 (1st Cir. 1978); *Allis-Chalmers Corp. v. OSHRC*, 542 F.2d 27, 30–31 (7th Cir. 1976); *cf. Kent Nowlin Construction Co. v. OSHRC*, 593 F.2d 368 (10th Cir. 1979) (unlikelihood of injury not dispositive when specific regulatory standard violated). This court would be derelict in its responsibilities under the OSH Act if we were to wait until an operator lost an arm and a livelihood in the crushing grip of these presses. *See*

9. The existence of these conditions is sufficient to support a finding that the violation is serious. *See Shaw Construction, Inc. v. OSHRC*, 534 F.2d 1183 (5th Cir. 1976). A serious violation requires only the showing of a "substantial probability that death or serious physical harm could result" from the condition. 29 U.S.C. § 666(j) (1976). There is no need to show that the condition has actually caused any injury. *Bethlehem Steel Corp. v. OSHRC*, 607 F.2d 1069 (3d Cir. 1979).

10. Faultless' manager of industrial relations testified at the hearing that since 1970, there had been no accidents or injuries attributable to these presses, notwithstanding over 900,000 hours of use and an estimated 1.8 to 2.7 million closures. The ALJ, however, credited Faultless for only 15 months of accident-free use without explaining why he rejected Faultless' evidence. We must reject this finding of the ALJ as lacking substantial evidentiary support and accept Faultless' version of the facts. This does not, however, require a different result because, as explained above, freedom from accidents is only one factor the ALJ should consider, and we believe that the record as a whole clearly supports the finding of a violation.

*Long Manufacturing Co. v. OSHRC*, 554 F.2d 903, 904–05 (8th Cir. 1977) ("The risk of serious and mangling injuries to workers [operating power presses] whose hands or arms are caught by a descending die is obvious and has long been recognized.") Indeed, "[t]he goal of the [OSH] Act is to prevent the first accident, not to serve as a source of consolation for the first victim or his survivors." *Mineral Industries & Heavy Construction Group v. OSHRC*, 639 F.2d 1289, 1294 (5th Cir. 1981). .

### III.

Faultless contends that the Secretary's application of the machine guarding standard to it violated due process because the standard's requirements are impermissibly vague. We believe that Faultless misunderstands the law.

First, Faultless premises its vagueness argument on its characterization of the machine guarding standard as a "performance" rather than a "specification" standard. According to Faultless, the courts and the Commission have struck down performance standards as unconstitutionally vague unless the standard's scope is limited by extrinsic norms, including industry customs and practices. Because, in the rubber industry, hydraulic rubber molding presses are not customarily guarded, Faultless asserts that application of the machine guarding standard does not provide it with sufficient and fair warning. Second, Faultless argues that the regulation is vague because other regulations specifically exempt its presses from any guarding requirements.

When considering remedial legislation such as the OSH Act and its implementing regulations, the purported vagueness of a standard is judged not on its face but rather in the light of its application to the facts of the case. *PBR, Inc. v. Secretary of Labor*, 643 F.2d 890, 897 (1st Cir. 1981); *McLean Trucking Co. v. OSHRC*, 503 F.2d 8, 10–11 (4th Cir. 1974). Moreover, the regulations will pass constitutional muster even though they are not drafted with the utmost precision; all that due process requires is a fair and reasonable warning. *Allis-Chalmers Corp. v. OSHRC*, 542 F.2d 27, 30 (7th Cir. 1976). The constitution does not demand that the employer be *actually aware* that the regulation is applicable to his conduct or that a hazardous condition exists.[11]

11. Although it apparently accepts our formulation of the due process standard as to notice, *see post* at 1190–1191, the dissent seems to require something more pointed—or even subjective—than the mere provision of a fair and reasonable warning. Thus, the dissent concludes that the "regulatory language . . . has failed to provide *actual notice* that the activity is subject to the provision." *Post* at 1192 (emphasis supplied). Moreover, the dissent argues that consideration of industry practice is necessary to provide Faultless with "actual notice." *Post* at 1193; *see post* at 1193. This analysis seems to import an individualized or subjective quality into the fair notice standard. Cf. *Pratt & Whitney Aircraft, Division of United Technologies Corp. v. Secretary of Labor*, 649 F.2d 96, 100–01 (2d Cir. 1981) (even if hazard must be "recognized" as required by general duty clause, this comports with objective standard).

The dissent also contends, citing judicial interpretations of the general duty clause, that Faultless must be on notice of a hazard connected with molding presses. To the extent that any proof of hazard is required here, we think such a requirement is governed by 29 C.F.R. § 1910.212(a)(3)(ii) (1980) and not by rules applicable to the general duty clause.

*See* notes 14, 17 *infra*. And we believe the dissent is incorrect in suggesting that Faultless must have "actual notice" of the hazard. *See S & H Riggers & Erectors, Inc. v. OSHRC*, 659 F.2d 1273, 1278 (5th Cir. 1981).

Thus, the dissent mischaracterizes the Fourth Circuit's decision in *McLean Trucking Co. v. OSHRC*, 503 F.2d 8 (1974) as "mak[ing] clear that when the due process issue is whether an employer *had notice* that a hazard existed, the inquiry is the same as that necessitated by the 'recognized hazard' language of [the general duty clause]." *Post* at 1194 (emphasis supplied). The language from *McLean* quoted by the dissent, *post* at 1194, makes clear that the hazard need not be known "necessarily by each and every individual employer." *McLean*, 503 F.2d at 11 n.5 (quoting 116 Cong. Rec. 38377 (remarks of Rep. Daniels)). Moreover, the Fourth Circuit concludes that "the totality of the foregoing elements was sufficient to convey to McLean a *reasonable understanding* of the conduct required of it." *McLean*, 503 F.2d at 11 (emphasis supplied). *Accord, Donovan v. Royal Logging Co.*, 645 F.2d 822, 829 (9th Cir. 1981) ("An employer need not be aware of [the hazard].").

We begin our analysis by noting that by its title—"General requirements for *all machines*"—the regulation on its face appears to apply to Faultless' hydraulic presses. 29 C.F.R. § 1910.212 (1980) (emphasis supplied.[12] Subdivision (a)(3)(ii) states that the point of operation of a machine "shall be guarded," and subdivision (a)(3)(iv) lists "*some* of the machines which usually require point of operation guarding," including "power-presses." 29 C.F.R. §§ 1910.212(a)(3)(ii) & (iv) (1980) (emphasis supplied). The methods of compliance are illustrated, in 29 C.F.R. § 1910.212(a)(1) (1980), by several nonexhaustive examples of point of operation guarding. Considered in the context of Faultless' hydraulic presses, which are encompassed not only within the generic term "power-presses" but also within the mandate of the regulation's application to "all machines," and given the need for guards on such presses to prevent injuries as a matter of elementary industrial safety,[13] we cannot conclude that the regulation as applied is unconstitutionally vague.[14] We note that other courts have similarly concluded that the regulation in question applies to all machines, *Irvington Moore, Division of U. S. Natural Resources, Inc. v. OSHRC*, 556 F.2d 431 (9th Cir. 1977); *Long Manufacturing Co., N.C. Inc. v. OSHRC*, 554 F.2d 903 (8th Cir. 1977), and is not unconstitutionally vague as applied in other like situations. *A.E. Burgess Leather Co. v. OSHRC*, 576 F.2d 948 (1st Cir. 1978);

*Long*, 554 F.2d at 907; *cf. PBR, Inc. v. Secretary of Labor*, 643 F.2d 890 (1st Cir. 1981) (29 C.F.R. § 1910.212(a)(1) not unconstitutionally vague when applied to railroad undercutter).[15]

In construing the regulation before us, we decline Faultless' invitation in effect to characterize the provision as "very general," "unclear," or a "performance standard" in order to lay the predicate for considering evidence of industry custom and practice. Faultless correctly notes that some courts have considered evidence of industry practice when construing very general or unclear regulations. Indeed, we note that industry practice may be relevant in limited situations to avoid prejudicing a party by the application of a generalized statute or regulation of unfocused import. Prejudice might arise when the regulatory impact resulted in a complex and costly compliance program in cases where there was no reasonable expectation that the regulation was applicable to the questioned conduct. The instant case, however, does not require or permit consideration of industry practice for the purpose of defining machine guarding requirements since we are confronted with *a clearly applicable, unarguable and specific regulation on the subject in question.* In general, courts have considered industry practice evidence only when a specific standard of expected employer conduct is proposed to be derived from a very general statutory or regulatory

**12.** More detailed guarding requirements for some specified types of machines are listed in the regulations immediately following the regulation in question. *See* 29 C.F.R. §§ 1910.-213–.219 (1980).

**13.** *See* National Safety Council, *Accident Prevention Manual For Industrial Operations*, ch. 29 (7th ed. 1974).

**14.** The dissent chides us for interpreting "section 1910.212 as though *any* machine falling within the technical definition of a power press *must* have point of operation guards." *Post* at 1191–1192 (emphasis in original). But, of course, this section applies only to machines which expose employees to injury. And the record before us adequately demonstrates that the "operation [of Faultless' presses] exposes an employee to injury." 29 C.F.R. § 1910.-212(a)(3)(ii) (1980). The farther one comes—

physically and procedurally—from the factory floor, the simpler it seems to perceive an accident-free history and a slow closing speed as rendering "safe" these powerful (and potentially bone-crushing) presses. Exposure to injury is a determination far better left to the ALJ and the Commission, to be reversed only if unsupported by substantial evidence.

**15.** Our recent decision in *Kropp Forge Co. v. Secretary of Labor*, 657 F.2d 119 (7th Cir. 1981) is distinguishable. In that case, the panel found that the general noise regulation (29 C.F.R. § 1910.95(b)(3) (1980)) was used by the Secretary as the basis of a detailed compliance order. None of the elements of the compliance order were explicitly provided in the regulation and the regulation itself was not as specific as the regulation at issue here.

command. *See, e.g., Kropp Forge Co. v. Secretary of Labor,* 657 F.2d 119 (7th Cir. 1981) (noise regulation—29 C.F.R. § 1910.-95(b) (1980)); *S & H Riggers & Erectors, Inc. v. OSHRC,* 659 F.2d 1273 (5th Cir. 1981) (personal protective equipment for construction industry—29 C.F.R. § 1926.28(a) (1980)); *Pratt & Whitney Aircraft, Division of United Technologies Corp. v. Secretary of Labor,* 649 F.2d 96, 100–01 (2d Cir. 1981) (general duty clause—29 U.S.C. § 654(a)(1) (1976)); *Donovan v. Royal Logging Co.,* 645 F.2d 822, 830, 831 (9th Cir. 1981) (general duty clause—29 U.S.C. § 654(a)(1) (1976)); *R. L. Sanders Roofing Co. v. OSHRC,* 620 F.2d 97 (5th Cir. 1980) (general duty clause —29 U.S.C. § 654(a)(1) (1976)); *B & B Insulation, Inc. v. OSHRC,* 583 F.2d 1364 (5th Cir. 1978) (personal protective equipment for construction industry—29 C.F.R. § 1926.28(a) (1980)); [16] *American Airlines, Inc. v. Secretary of Labor,* 578 F.2d 38 (2d Cir. 1978) (personal protective equipment— 29 C.F.R. § 1910.132 (1980)); *Cape & Vineyard Division, New Bedford Gas and Edison Light Co. v. OSHRC,* 512 F.2d 1148 (1st Cir. 1975) (personal protective equipment—29 C.F.R. § 1910.132 (1980)).[17]

The regulation here, on the other hand, unlike regulations relating, for example, to noise or to personal protective equipment, or to the general duty clause regulations, is sufficiently specific as to the machines affected and as to the methods of compliance to reasonably apprise Faultless in clear terms that its presses must be guarded. The machine-guarding regulation applies to all machines, defines the areas that must be guarded, states what an effective guarding device must achieve and even provides several examples of guarding devices. Neither the noise regulation standard nor the personal protective equipment standard nor the general duty clause are comparably specific. We agree with the holding of *A. E. Burgess Leather Co. v. OSHRC,* 576 F.2d 948 (1st Cir. 1978), that industry practice should not be considered when construing the regulation before us because the standard for employer conduct is quite specific and essentially requires no such construction.

■ Our position follows without question from the stated purposes of the OSH Act. On the other hand, carried to its logical conclusion, Faultless' argument for reliance on industry practice would permit employers to avoid compliance with specific safety mandates by relying on the (perhaps equally objectionable) practices of their peers. *Cf. Voegele Co. v. OSHRC,* 625 F.2d 1075, 1078–79 (3rd Cir. 1980) (even those courts that consider industry custom and practice do not ignore reasonable person test because to do so would allow entire industries to avoid liability for unsafe conditions). Nothing in the OSH Act or its legislative history requires or permits the Secretary to await an industry consensus about unsafe conditions before moving to enforce. *See Bristol Steel & Iron Works, Inc. v. OSHRC,* 601 F.2d 717 (4th Cir. 1979).[18]

---

**16.** *But see Voegele Co. v. OSHRC,* 625 F.2d 1075, 1078–79 (3rd Cir. 1980) (criticizing *B & B's* excessive reliance on industry practice and custom and noting that other courts consider such evidence as one aspect of the reasonable person standard).

**17.** The dissent apparently argues that due process requires us to consider industry practice and custom when interpreting section 1910.212. But the cases cited to support this proposition—*Royal Logging, Sanders,* and *McLean Trucking Co. v. OSHRC,* 503 F.2d 8 (4th Cir. 1974)—all involve violations of the *general duty clause.* To establish a violation of the general duty clause, the Secretary of Labor must prove, as one element of his *prima facie* case, that a *recognized* hazard exists. *Royal Logging,* 645 F.2d at 829; *Sanders,* 620 F.2d at 99; *McLean,* 503 F.2d at 10. In these circumstances it makes sense that whether a hazard is *recognized* may well depend in part on *industry practice.* On the other hand, there is *no* requirement to establish a recognized hazard as part of the Secretary's case under section 1910.212. All that this regulation demands is that the machine must "expose[ ] an employee to injury." 29 C.F.R. § 1910.212(a)(3)(ii) (1980). We believe (and the cases support us) that due process does not require an examination of industry practice to establish this lesser and different standard of exposure to injury.

**18.** Indeed, unwarranted reliance on industry practice and custom may reduce government regulation under the OSH Act to unintended

Faultless also asserts, we think erroneously, that because its presses are either exempted or not covered under other machine-guarding regulations, the Secretary's application of 29 C.F.R. § 1910.-212(a)(3)(ii) (1980) violates due process. Thus, although 29 C.F.R. § 1910.216 (1980) is, as Faultless argues, applicable to the rubber and plastics industries, this regulation contains more detailed guarding requirements applicable only to *mills and calenders.* But hydraulic rubber molding presses are not within the definition either of a mill or of a calendar. *See* 29 C.F.R. §§ 1910.211(c)(2)–(3) (1980). Faultless further contends that its presses are excluded from the more specific guarding requirements of 29 C.F.R. § 1910.217 (1980) applicable to power presses and, therefore, this "specific" regulation must govern as against the "general" language of 29 C.F.R. § 1910.212 (1980). Even if Faultless' presses are thought to be excluded from section 1910.217 (and we do not decide this question here), the exclusions in section 1910.-217(a)(5) apply only to the detailed guarding requirements *contained in that section of the regulations.* Exclusion of a machine from the requirements of section 1910.217

does not preclude application to it of the guarding requirements of section 1910.212. This conclusion is clear because the latter regulation, by its terms, applies to *all* machines.

The OSH Act regulations expressly provide that exclusion under certain specific regulatory commands does not preclude application of the slightly more generalized, albeit explicitly comprehensive, command of another regulation. *See* 29 C.F.R. § 1910.5(c)(2) (1980). The courts that have considered the relationship between section 1910.217 and section 1910.212 have unanimously concluded that a machine exempted under section 1910.217 continues to be covered under 1910.212. *Diebold, Inc. v. Marshall,* 585 F.2d 1327, 1334 (6th Cir. 1978);[19] *Irvington Moore, Division of U. S. Natural Resources, Inc. v. OSHRC,* 556 F.2d 431, 435 (9th Cir. 1977); *Long Manufacturing Co., N. C. Inc., v. OSHRC,* 554 F.2d 903, 908 (8th Cir. 1977). As noted in *Diebold,* appellate courts will not overturn the "Commission's reasonable interpretations of the Secretary's regulations." 585 F.2d at 1334 (footnote omitted).[20] Thus, we find no merit in Faultless' claim of a due process violation.[21]

industry *self-regulation* pursuant to traditional methods of operation. An interpretation of the Secretary's regulations placing too much weight on industry practice and custom would also fail to comport with the OSH Act's purpose of "assur[ing] so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b) (1976).

19. Although the *Diebold* court held that section 1910.212 was applicable to machines arguably exempted by section 1910.217, the court ultimately concluded that section 1910.212, as applied to the facts of that case, violated due process. We think *Diebold* is distinguishable and, in any event, should not govern the instant case. No other court is in accord with *Diebold's* constitutional holding. *See PBR, Inc. v. Secretary of Labor,* 643 F.2d 890, 897 (1st Cir. 1981); *Irvington Moore, Division of U. S. Natural Resources, Inc. v. OSHRC,* 556 F.2d 431, 436 (9th Cir. 1977); *Long Manufacturing Co., N. C. Inc. v. OSHRC,* 554 F.2d 903, 908 (8th Cir. 1977). Moreover, the *Diebold* court relied on three specific findings, which we find inapplicable to the instant case, to support its holding.

First, even though the *Diebold* court held that section 1910.217 was inapplicable, it believed that inartful drafting of that regulation could

have misled the employer and thus contributed to the alleged vagueness of section 1910.212. We do not understand this logic and find it inappropriate to apply to the instant case. Second, the *Diebold* court, to support its constitutional holding, relied on industry practice evidence, which we have discussed *supra* and found to be irrelevant to the instant case. Third, in *Diebold* there was a pattern of disparate administrative enforcement, which we also find absent in the instant case, *see* note 20 *infra.*

20. We also reject Faultless' claim that the Commission and the courts have inconsistently interpreted sections 1910.212 and 1910.217. The only apparently inconsistent decision cited by Faultless—*Main Tubular Products, Inc.,* 1980 Occ.Saf. Health Dec. ¶ 24,668—was an ALJ decision, unreviewed by the Commission. *Cf. Leone Construction Co.,* 1975–76 Occ.Saf. Health Dec. ¶ 20,387 (1975) (Rev. Comm'n) (unreviewed ALJ decision does not bind Commission as precedent). *Main Tubular* relied on the combination of factors cited in *Diebold,* which we find inapplicable to this case. *See* note 19 *supra.*

21. Faultless' argument that the regulation is vague because it fails to disclose how to com-

## IV.

Faultless' final contention is that the ALJ improperly imposed upon it the burden of proving the infeasibility of the Secretary's compliance order. In addition, and regardless of any applicable burden of proof, Faultless argues that the ALJ erred in holding that the evidence Faultless presented on the feasibility issue was insufficient. We shall consider each contention separately.

As to the first, courts have placed the burden of demonstrating the feasibility of a proposed compliance order on the Secretary in only two situations. First, the Secretary must demonstrate the feasibility of any remedial administrative or engineering controls ordered under 29 C.F.R. § 1910.-95(b)(1) (1980) (the noise regulation standard). *See Diversified Industries Division, Independent Stave Co. v. OSHRC*, 618 F.2d 30 (8th Cir. 1980); *RMI Co. v. Secretary of Labor*, 594 F.2d 566 (6th Cir. 1979); *Turner Co. Division of Olin Corp. v. Secretary of Labor*, 561 F.2d 82 (7th Cir. 1977). The justification for placing the burden on the Secretary in noise regulation cases is that the Secretary is explicitly required by the regulation to consider feasibility *before* issuing a compliance order. Second, the Secretary must demonstrate the feasibility of a compliance order issued under a regulation that does not, on its face, expressly provide for any particular means of compliance. *See Donovan v. Royal Logging Co.*, 645 F.2d 822, 829 (9th Cir. 1981) (general duty clause); *Ray Evers Welding Co. v. OSHRC*, 625 F.2d 726, 733 (6th Cir. 1980) (personal protective equipment regulation); *Bristol Steel & Iron Works, Inc. v. OSHRC*, 601 F.2d 717, 723–24 (4th Cir. 1979) (personal protective equipment regulation); *General Electric Co. v. OSHRC*, 540 F.2d 67, 69–70 (2d Cir. 1976) (eye protection regulation); *National Realty and Construction Co. v. OSHRC*, 489 F.2d 1257, 1268 (D.C.Cir.1973)

(general duty clause). It is indeed appropriate for the Secretary to carry the burden in such cases when the compliance remedy is based upon a very general statutory or regulatory command that does not describe for the employer any specific methods for compliance.

Unlike the regulations involved in the above cited cases, the machine-guarding regulation does specify several ways for an employer to comply with its standards. Three specific guarding techniques—"barrier guards, two-hand tripping devices [and] electronic safety devices" are set out in the regulation. 29 C.F.R. § 1910.212(a)(1) (1980); *see Ace Sheeting & Repair Co. v. OSHRC*, 555 F.2d 439 (5th Cir. 1977). Applying a like analysis to particularized standards, the First Circuit in *A. E. Burgess Leather Co. v. OSHRC*, 576 F.2d 948, 952 (1978) held that the employer, not the Secretary, must carry the burden of establishing infeasibility when the compliance order is issued under the "specific" standards in 29 C.F.R. § 1910.212(a)(3)(ii). *Accord, PBR, Inc. v. Secretary of Labor*, 643 F.2d 890, 897 (1st Cir. 1981). Thus, we conclude that the ALJ properly placed the burden of demonstrating infeasibility upon Faultless.

On the question of sufficiency of the evidence of infeasibility, after reviewing the evidence presented by Faultless on these issues, we conclude that the ALJ properly held that Faultless failed to demonstrate the infeasibility of complying with the Secretary's order. Feasibility, in the context of safety regulations, refers not only to technical feasibility but also to economic feasibility. *See International Harvester Co. v. OSHRC*, 628 F.2d 982, 987–89 (7th Cir. 1980); *A. E. Burgess Leather Co. v. OSHRC*, 576 F.2d 948, 951 n.2 (1st Cir. 1978); *Turner Co. Division of Olin Corp. v. Secretary of Labor*, 561 F.2d 82, 85–86 (7th

ply with the machine guarding mandate is similarly without merit. 29 C.F.R. § 1910.212(a)(1) (1980) lists three specific guarding methods and section 1910.212(a)(3)(ii) notes that "[t]he guarding device shall be in conformity with any

appropriate standards . . . ." *See F. H. Lawson Co.*, 1980 Occ.Saf. Health Dec. ¶ 24,277 (Rev. Comm'n) (guarding standard allows employer flexibility).

Cir. 1977). We note first that Faultless did not argue either before the ALJ or on this appeal that it was technologically infeasible to install some type of point of operation guarding device on its presses. Thus, we are left only with the issue of economic feasibility.

 A successful economic feasibility argument must demonstrate both that it is extremely costly for the employer to comply with the Secretary's order and that the employer cannot absorb this cost. Faultless claims that two-hand controls would increase its yearly operating costs by $116,000 (lost production time and capacity); in addition, Faultless has alleged that it would expend $82,000 for new presses to make up for lost production time generated by the use of two-hand controls together with $34,-000 to install the two-hand controls. This evidence alone, however, does not demonstrate economic infeasibility. Faultless has not alleged or demonstrated that it cannot absorb or pass on in the price of the product this added expense. Although the expense of installing two-hand controls may be somewhat burdensome, economic infeasibility is established only when the employer's existence as an entity is financially imperiled by compliance. *See Arkansas-Best Freight Systems, Inc. v. OSHRC*, 529 F.2d 649, 654 (8th Cir. 1976); *cf. Industrial Union Department, AFL–CIO v. Hodgson*, 499 F.2d 467, 478 (D.C.Cir.1974) (OSH Act contemplates demise of employers who cannot comply with safety standards); *National Realty and Construction Co. v. OSHRC*, 489 F.2d 1257, 1266 n.37 (D.C.Cir.1973) (if cost to implement precautionary measure threatens employer's economic vitality, this precaution should be proposed by regulation and not by compliance order). With respect to the economic burdens what ideally occurs is that costs which may otherwise be imposed on employees are internalized by compliance orders in the cost of the product to consumers. The economic heart of OSHA is the internalization of certain external costs of unsafe or unhealthy conditions otherwise imposed, at least in part, on innocent employees.

Moreover, we agree with the ALJ's conclusion that Faultless' cost computations were inflated and conjectural. Faultless failed to explain various discrepancies in the figures it used to determine the number of new presses required to compensate for the alleged lost production time generated by two-hand controls. We also question the accuracy of Faultless' computations of lost production time. According to Faultless, much of this lost production time will be caused by operators standing at their presses for seven to ten seconds as they hold down the two-hand tripping control to activate the closing cycle. The ALJ found, however, that operators stand at their machines during this interval even though they now use only a one-hand start button. Further, we are puzzled by Faultless' assertion that 21 to 30 seconds per hour (three closures per hour—Faultless' most liberal estimate) translate into a loss of production time requiring Faultless to expand its production capacity by two presses—or more than 11%. Faultless' most egregious error, however, has been to double count, at least in part, the cost of lost production time and capacity ($116,000) and the cost of new presses ($82,000) when the new presses are intended to compensate for the loss of capacity. Thus, we find that Faultless failed to demonstrate the infeasibility of the Secretary's order.

Petition for review denied.

PELL, Circuit Judge, dissenting.

I respectfully dissent from the majority's conclusion that application of 29 C.F.R. § 1910.212(a)(3)(ii) (1980) to the hydraulic presses utilized by Faultless was commensurate with due process.

At issue in this case is whether Faultless had the requisite notice that the point of operation of its hydraulic molding presses "expose[d] an employee to injury." 29 C.F.R. § 1910.212(a)(3)(ii) (1980). To meet the requirements of due process, a regulatory standard must provide the employer a "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United*

*States v. Petrillo*, 332 U.S. 1, 8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877 (1947). Regulatory language that, on its face, is clearly applicable would provide such notice. Because we judge a standard in light of its application to the facts of a case, *see United States v. National Dairy Corp.*, 372 U.S. 29, 36, 83 S.Ct. 594, 599, 9 L.Ed.2d 561 (1963), any facial ambiguity might be clarified by the employer's actual experience with the activity in question. Finally, an industrial custom of guarding presses such as those utilized by Faultless would be deemed to have put the Company on notice that the hazard which triggers section 1910.212 existed in their operation. *See, e.g., B&B Insulation, Inc. v. OSHRC*, 583 F.2d 1364, 1369 & n.10 (5th Cir. 1978) (quoting 116 Cong.Rec. 38377 (1970) (remarks of Rep. Daniels)).

The majority opinion finds the language of section 1910.212 so "clearly applicable" to the presses in question that it does not inquire further. I disagree, for reasons discussed below, with this conclusion. Further, Faultless's actual experience with the machines did not constitute notice that a hazard existed. I therefore think that industrial practice was a relevant consideration in this case. Had the ALJ considered the prevailing custom in reaching his decision, which he did not, he would necessarily have concluded from the record that hydraulic mold presses are *not* usually guarded. I cannot agree therefore that Faultless had a sufficient warning, measured by any "common understanding or practice," that

its presses required guarding pursuant to section 1910.212.[1]

First, I will explain why I do not find the language of 29 C.F.R. § 1910.212(a)(3)(ii) (1980) conclusive. The majority finds the regulation a *"clearly applicable, unarguable and specific regulation on the subject in question"* (emphasis in original) by emphasizing selected language of the regulation. A mere change of emphasis, however, illustrates why the regulatory language alone did not necessarily warn Faultless that its presses required guarding. The title of the pertinent section is *"General requirements for all machines."* 29 C.F.R. § 1910.212 (1980) (emphasis added). Subdivision (a)(3)(ii) states, in part: "The point of operation of machines *whose operation exposes an employee to injury*, shall be guarded." 29 C.F.R. § 1910.212(a)(3)(ii) (1980) (emphasis added). A later subdivision listing "some of the machines which *usually* require point of operation guarding" includes "power presses." 29 C.F.R. § 1910.-212(a)(3)(iv)(d) (1980) (emphasis added).

The majority reads section 1910.212 as though *any* machine falling within the technical definition of a power press *must* have point of operation guards. This reading ignores the fact that the regulation is applicable *only* if an employee is exposed to injury. Further, the fact that power presses "usually" create the requisite hazard is not equivalent to a statement that all power presses do so.[2] Faultless apparently con-

---

1. The ALJ made no reference to any standard of common understanding such as a "reasonable employer." He did not even make a specific finding of either law or fact that the employer had prior notice that the presses required guarding. He did conclude, as a matter of law, that "Respondent's molding press is covered by the standard designated as 29 C.F.R. 1910.-212(a)(3)(ii)." In my view, that finding does not address, let alone resolve, the question whether the employer should reasonably have recognized the applicability of section 1910.212 prior to the date it was found in violation thereof.

 In a recent case, Judge Godbold similarly rejected the Commission's equation of *its* finding that safety equipment was required pursuant to 29 C.F.R. § 1926.28(a) (1980) with a finding that a reasonable employer would have

foreseen the need for such precautions. *S&H Riggers & Erectors, Inc. v. OSHRC*, 659 F.2d 1273 (Former 5th Cir. 1981).

2. Other courts have recognized what should be clear from the regulatory language, that guards on power presses are required *only* if the employee is actually exposed to injury. *Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1333 (6th Cir. 1978) ("section 1910.212 [is] a general 'catch-all' or 'gap-filler' intended to impose a point of operation guarding requirement in any case *where a hazard exists* and guarding is feasible." (emphasis added)); *Irvington Moore v. OSHRC*, 556 F.2d 431, 436 (9th Cir. 1977) ("If the operation of the machine does not expose employees to injury, no guard is required under .212.").

cluded that their hydraulic molds were among the small class of power presses not creating a hazard and therefore not requiring guarding pursuant to 29 C.F.R. § 1910.-212(a)(3)(ii) (1980). This conclusion is not precluded by the language of the regulation. We must therefore determine whether Faultless's experience with the presses should have put it on notice that a hazard existed.

Nothing in the record suggests that Faultless should have recognized a potential for injury. First, the presses had an extremely slow closure speed, moving approximately one inch per second or slower. They have little in common with the rapidly moving machines, such as punch presses, that one normally associates with the term "power press." Second, it is significant that *no* employee had been injured by the molds since records were first kept in 1970, despite 900,000 hours of use and an estimated 1.8 to 2.7 million closures. Third, the Company had a clearly articulated rule that employees were *not* to reach into an activated press but rather were to move immediately to the next machine after commencing the closure cycle. The ALJ did not discredit the testimony as to this rule nor did he find that the Company either implicitly encouraged or willingly permitted employees to ignore it. The ALJ relied on the fact that the policy was not conclusive as to whether employees did in fact reach into the machines, referring to the testimony of La Mar who claimed that he had seen employees do so.

La Mar also testified that he had suggested guarding the machines approximately ten years earlier. The record does *not* establish, however, that La Mar *ever* informed Faultless, prior to his testimony before the ALJ, that he had witnessed employees reaching into the machines. His

verbal suggestion regarding guarding was that Faultless "install something of a guarding nature for the employees to be unable to reach in these presses once they've been activated." The suggestion was apparently made in response to a "good ideas" program instituted by the Company and pursuant to which some employees were compensated for their suggestions. Under these circumstances, La Mar's "idea" that the machines might be guarded is not evidence that the machines were hazardous in the first place, a conclusion evidently shared by Faultless.[3] Even if La Mar's testimony is an accurate record of his observations, there is no evidence in the record that Faultless was aware, prior to the hearing before the ALJ, that their non-discretionary safety rule was being disobeyed.

The speed at which the presses closed and the safety record at Faultless convince me that Faultless did not err in concluding that the molds failed to create the exposure to injury that is a prerequisite to the guarding duty embodied in 29 C.F.R. § 1910.-212(a)(3)(ii) (1980).

If the regulatory language, considered on its face and in light of the employer's experience, has failed to provide actual notice that the activity is subject to the provision, one should consider the prevailing custom in the industry. *E.g., B&B Insulation, Inc. v. OSHRC*, 583 F.2d 1364, 1369 & n.10 (5th Cir. 1978) (quoting 116 Cong.Rec. 38377 (1970) (remarks of Rep. Daniels)). I do not suggest that industrial practice should negate the applicability of an otherwise clearly relevant regulation.[4] The significance of industrial custom is that it will in some cases imply the notice that is otherwise lacking. Further, if no one in the industry recognizes the relevance of a particular regulation, that fact furthers the conclusion that a reasonable employer would not have foreseen its applicability.

---

**3.** La Mar testified that, after the Company failed to act on his suggestion, he was told "in a roundabout way ... that [the machines] were safe."

**4.** It is clearly within the power of the Secretary to promulgate regulations setting a more stringent safety standard than that commonly employed by the industry. *E.g., B&B Insulation,*

*Inc. v. OSHRC*, 583 F.2d 1364, 1371 & n.13 (5th Cir. 1978) (quoting *Society of Plastics Industry, Inc. v. OSHA*, 509 F.2d 1301, 1309 (2d Cir. 1975), *cert. denied*, 421 U.S. 992, 95 S.Ct. 1998, 44 L.Ed.2d 482). Allowing prevailing industrial practice to displace such regulations would be contrary to Congressional intent.

In this case, reference to industrial custom would not have remedied the lack of notice. Faultless presented testimony by two persons extremely familiar with their industry. Both testified that they had never seen guards on machines such as those used by Faultless.

The majority opinion strenuously rejects the relevance of industrial practice to a case in which the pertinent regulation is clearly applicable and specific. Although I agree with this proposition as a general statement of law, as noted *supra*, I disagree with the majority's reliance on it in the case at bar because I do not find that section 1910.212 gave the employer such actual notice. I think industrial practice is relevant here because it furthers the conclusion that a reasonable employer would not have found sufficient warning of the provision's applicability in the regulatory language.

The majority has distinguished a number of cases that considered industrial practice on the bare conclusion that they involved more "general" regulations or statutes than section 1910.212.[5] A closer examination of these cases demonstrates that at least two turned on the precise question at issue here: whether the employer had notice that his activity constituted a hazard. Both *Donovan v. Royal Logging Co.*, 645 F.2d 822 (9th Cir. 1981), and *R. L. Sanders Roofing Co. v. OSHRC*, 620 F.2d 97 (5th Cir. 1980) (per curiam), involved citations pursuant to the general duty clause, 29 U.S.C. § 654(a)(1) (1976). That clause requires an employer to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees." *Donovan* applied a "reasonably prudent employ-

er" standard, 645 F.2d at 831, to determine whether a rollover was a foreseeable hazard to operators of earthmoving machinery.[6] *Sanders* referred to the "common knowledge of safety experts who are familiar with the circumstances of the industry or the activity in question," 620 F.2d at 99, in determining whether falling off a flat roof was a recognized hazard to roofers. Both courts therefore gave consideration to the industrial context in deciding whether the employer had the required notice that the activity in question created a hazard subject to regulation.

Another case directly on point, which is not cited by the majority, is *McLean Trucking Co. v. OSHRC*, 503 F.2d 8 (4th Cir. 1974). In *McLean*, the citation had been issued pursuant to 29 C.F.R. § 1910.132(a) (1980), which requires the wearing of protective equipment "wherever it is necessary by reason of hazards of processes or environment." McLean dock employees transferred freight varying in weight from 10 to 1500 pounds. Seventy percent of the transfers were made by hand or with the use of dollies. The employees were not required to wear any protective footwear. Ten foot injuries had been reported in the three years prior to inspection. Because section 1910.132(a) referred to "hazards," the Fourth Circuit quoted and analyzed the general duty statute, 29 U.S.C. § 654(a)(1) (1976), which is quoted *supra.* The court stated that the test was " 'whether or not a reasonable person would recognize a hazard of foot injuries to dockmen, * * *.' " *Id.* at 10 (quoting *Ryder Truck Lines, Inc. v. Brennan*, 497 F.2d 230, 233 (5th Cir. 1974)). The court made clear that this "reasonable man" standard might reflect industrial custom by quoting a portion of the Congres-

---

5. Because we must examine a standard in light of its application, *see United States v. National Dairy Products Corp.*, 372 U.S. 29, 36, 83 S.Ct. 594, 599, 9 L.Ed.2d 561 (1963), I find it difficult to understand how the majority can distinguish arguably analogous cases merely by labeling the pertinent regulations as more general. If we were to attribute weight to labels, however, it is noteworthy that section 1910.212 is titled "general requirements" and that several courts have referred to the generality of the provision.

*Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1333 (6th Cir. 1978); *Irvington Moore v. OSHRC*, 556 F.2d 431, 435–36 (9th Cir. 1977); *Long Mfg. Co. v. OSHRC*, 554 F.2d 903, 905, 908–09 (8th Cir. 1977).

6. The *Donovan* court was also concerned with whether a reasonable employer would have alleviated the hazard, if one existed, by a particular means, the use of seatbelts.

sional Record: " 'A recognized hazard is a condition that is known to be hazardous, and is known not necessarily by each and every individual employer but is known taking into account the standard of knowledge in the industry.' " 503 F.2d at 11 n.5 (quoting 116 Cong.Rec. 38377 (1970) (remarks of Rep. Daniels)). Applying this test, the *McLean* court found that application of the regulation was consistent with due process.

*McLean* makes clear that when the due process issue is whether an employer had notice that a hazard existed, the inquiry is the same as that necessitated by the "recognized hazard" language of 29 U.S.C. § 654(a)(1) (1976). *Donovan* and *Sanders* should not therefore be so readily dismissed as involving a "general" standard. Further, *McLean, Donovan,* and *Sanders* all recognized that an employer's conduct must be judged by some objective standard. Such an objective standard is precisely what is lacking in the case at bar.

Five other cases that referred to industrial custom are also distinguished by the majority as involving "very general statutory or regulatory commands." *S&H Riggers & Erectors, Inc. v. OSHRC,* 659 F.2d 1273 (Former 5th Cir. 1981); *Kropp Forge Co. v. Secretary of Labor,* 657 F.2d 119, 124 n.10 (7th Cir. 1981);[7] *B&B Insulation, Inc. v. OSHRC,* 583 F.2d 1364 (5th Cir. 1978); *American Airlines, Inc. v. Secretary of Labor,* 578 F.2d 38 (2d Cir. 1978); *Cape & Vineyard Division, New Bedford Gas & Edison Light Co. v. OSHRC,* 512 F.2d 1148 (1st Cir. 1975). Each of these cases involves the means of compliance required of an employer once it is determined that a hazard exists. Four of the cases involve regulations requiring personal protective equipment that make no statement as to the kinds of equipment required or the degree of protection necessary.[8] *Kropp* involved a citation pursuant to 29 C.F.R. § 1910.95(b)(3) (1980) which required only a "continuing effective hearing conservation program." *Kropp*

was found in violation by the Commission because its hearing program did not involve six elements deemed essential by the Commission but nowhere cited in the regulation. By contrast, section 1910.212(a), at issue here, does provide some examples of appropriate guarding devices. I readily agree that the regulation with which we are concerned is more specific as to the appropriate *means of compliance* than the regulations pertinent to the cases cited above. I do not think that this greater specificity is at all relevant, however, to the question whether the employer had notice that a hazard or potential for injury existed.

The majority follows the holding of *A. E. Burgess Leather Co. v. OSHRC,* 576 F.2d 948 (1st Cir. 1978), in concluding that the degree of specificity of section 1910.-212(a)(3)(ii) precludes consideration of industry practice. In *Burgess,* the employers admitted that their beam dinker created some risk. They questioned whether it created the "potential for injury" that triggers the regulatory section and whether a feasible means of mitigation existed. Like *Faultless,* the employers in *Burgess* demonstrated the machine's perfect safety record. The Commission concluded that the risk was sufficient to require guarding and that a means of abatement existed. On review, the First Circuit discussed those cases that have looked to industry practice and concluded that such reference was unnecessary in the case before it.

The *Burgess* court denied the petition for review because "substantial evidence that the beam dinker exposed its operator to injury, and therefore violated the Act, existed in the record." *Id.* at 951. The First Circuit panel did not discuss whether the employers had sufficient warning, prior to issuance of the citation, that the dinker constituted a hazard. The mode of analysis in *Burgess* is that employed by the majority in the instant case: the findings of the

---

7. The *Kropp* court referred to industrial custom only insofar as it found no evidence thereof contained in the record.

8. *S&H Riggers & Erectors* and *B&B Insulation* involved citations pursuant to 29 C.F.R. § 1926.28(a) (1980). *American Airlines* and *Cape & Vineyard* were decided pursuant to 29 C.F.R. § 1910.132(a) (1980).

Commission, pursuant to an administrative hearing, are deemed synonymous with what the employer should have known. Like the Fifth Circuit in *B&B Insulation, Inc. v. OSHRC*, 583 F.2d 1364 (5th Cir. 1978), I do not find this approach consistent with due process:

> The Commission here purported to decide what the reasonable employer in B&B's industry would have done under the conditions for which B&B was cited. The Commission's conclusion is inaccurate because it is based entirely upon the opinion of people employed by the Government and depends not at all upon the evidence drawn from the people employed by the industry. This application of the reasonable person rule stands the principle on its head.... In other words, the Commission would assert the authority to decide what a reasonable prudent employer would do under particular circumstances, even though in an industry of multiple employers, not one of them would have followed that course of action.

*Id.* at 1370.[9]

I do not question the Secretary's power to require guards on hydraulic mold presses. I do suggest, however, that such a requirement must be imposed pursuant to the rulemaking provision of the Occupational Safety and Health Act, 29 U.S.C. § 655(b) (1976), rather than through the adjudicatory process.[10] Faultless did not have sufficient warning, prior to its being cited for a violation of 29 C.F.R. § 1910.212(a)(3)(ii) (1980), that its presses required guarding pursuant to that section. The regulatory language, both on its face and in light of Faultless's experience with its machines, failed to provide adequate notice. Prevailing custom in the industry could not have

cured the lack of notice; rather, it could only have reinforced Faultless's conclusion that its machines did not require guarding. To enforce the citation in the instant case violates the employer's right to due process.

---

9. The majority opinion notes that *B&B Insulation* was criticized by the Third Circuit in *Voegele Co. v. OSHRC*, 625 F.2d 1075, 1078–79 (3d Cir. 1980), for its excessive reliance on industry practice. In *S&H Riggers & Erectors, Inc. v. OSHRC*, 659 F.2d 1273 (Former 5th Cir. 1981), the court recently clarified that it did not find industry practice conclusive but only one probable component of an objective standard.

10. *See, e.g., Kropp Forge Co. v. Secretary of Labor*, 657 F.2d 119, 124 n.10 (7th Cir. 1981); *S&H Riggers & Erectors, Inc. v. OSHRC*, 659 F.2d 1273, 1277–78 (Former 5th Cir. 1981); *R. L. Sanders Roofing Co. v. OSHRC*, 620 F.2d 97, 101 (5th Cir. 1980) (per curiam); *B&B Insulation, Inc. v. OSHRC*, 583 F.2d 1364, 1371–72 (5th Cir. 1978).